**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

**F I L E D**
May 30, 2012

No. 10-60411, consolidated with Case Numbers 10-60413,
10-60414, 10-60415, 10-60416

GULF RESTORATION NETWORK, INC.; SIERRA CLUB, INC.,

     Petitioners

v.

KEN SALAZAR, Secretary of the Department of Interior; WILMA LEWIS, Assistant Secretary, Land and Minerals Management, Department of the Interior; MICHAEL R. BROMWICH, Director, Minerals Management Service, Department of the Interior,

     Respondents

No. 10-60417, consolidated with Case Numbers 10-60468, 10-60475, 10-60483, 10-60488, 10-60489, 10-60491, 10-60496, 10-60499, 10-60500

CENTER FOR BIOLOGICAL DIVERSITY,

     Petitioner

v.

KEN SALAZAR, Secretary of the Department of Interior; MICHAEL R. BROMWICH, Director of the Minerals Management Service; MINERALS MANAGEMENT SERVICE,

     Respondents

Consolidated with 10-60490

CENTER FOR BIOLOGICAL DIVERSITY, SIERRA CLUB, INCORPORATED,

      Petitioners

v.

KEN SALAZAR, Secretary of the Department of Interior; MICHAEL R. BROMWICH, Director of the Minerals Management Service; MINERALS MANAGEMENT SERVICE,

      Respondents

Petitions for Review of Orders of the
Department of Interior[1]

Before HIGGINBOTHAM, DENNIS, and PRADO, Circuit Judges.

DENNIS, Circuit Judge:

On April 20, 2010, BP's *Deepwater Horizon*, an oil drilling rig on the outer continental shelf, 50 miles from Louisiana, exploded, causing a three-month long spill of 4.9 million barrels of oil into the Gulf of Mexico. Before and during the oil spill, the Department of the Interior (DOI)[2] continued to process mineral

---

[1] Oral argument was heard together in these cases and, because of the "overlapping issues presented . . . , we . . . consolidate them for disposition." *FG Hemisphere Assocs, LLC v. Republique du Congo*, 455 F.3d 575, 580 (5th Cir. 2006).

[2] The approvals were issued by the Mineral Management Service (MMS), a division of the DOI. In June 2010, MMS was redesignated the Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE). *See* Secretarial Order No. 3302, U.S. Dep't of the Interior, *available at* http://www.doi.gov/deepwaterhorizon/loader.cfm?cs Module=security/getfile&PageID=35872. BOEMRE was subsequently divided, on October 1, 2011, into the Bureau of Safety and Environmental Enforcement, the Bureau of Ocean Energy Management, and the Office of Natural Resources Revenue. *See* Reorganization of Title 30: Bureaus of Safety and Environmental Enforcement and Ocean Energy Management, 76 Fed. Reg. 64432 (Oct. 18, 2011). For simplicity, we will refer to the entity that approved the plans as the "DOI."

Nos. 10-60411 et al.

lessees' applications for approval of plans for exploration and development of new oil wells.

The petitioners, the Sierra Club, the Gulf Restoration Network, and the Center for Biological Diversity (the Center), non-profit environmental protection organizations, filed petitions for judicial review in this court challenging sixteen DOI plan approvals, issued between March 29 and May 20, 2010, under the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331-1356a.[3] Specifically, the petitioners argue that the DOI's approvals of the plans violated both the OCSLA and the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321 *et seq.*, because: (1) the DOI failed to consider the BP *Deepwater Horizon* disaster in approving further deepwater drilling; and (2) the DOI conducted an inadequate review of the plans under NEPA, because it incorrectly applied "categorical exclusions" (from the NEPA requirements of preparing environmental assessments or environmental impact statements) to those plans, which should not have been so excluded because they involved drilling in "relatively untested deep water," "areas of high biological sensitivity," "areas of high seismic risk or seismicity," or "areas of hazardous natural bottom conditions." As to the second argument, the Center emphasizes that the BP *Deepwater Horizon* disaster further shows the inherent inadequacy of the DOI's environmental analyses underlying the categorical exclusions. The petitioners request that we vacate the DOI's approvals of the sixteen plans and remand the plans to the DOI for further proceedings consistent with OCSLA and NEPA.

We conclude that: (1) the petitioners' OCSLA-based challenges are justiciable, except for four, which have become moot; (2) the DOI's approval of the exploratory and development plans are subject to judicial review by this court under OCSLA, 43 U.S.C. § 1349(c)(2); (3) the petitioners' failure to

---

[3] Additionally, several of the companies which submitted the approved plans intervened and are also participating in this appeal.

3

Nos. 10-60411 et al.

participate in the administrative proceedings related to the DOI's approval of the plans as required by § 1349(c)(3) does not oust our jurisdiction because that participation requirement is a non-jurisdictional administrative exhaustion rule; but, (4) the petitioners have not shown sufficient justification for excusing them from that exhaustion requirement in this case. Accordingly, except for four of the petitioners' petitions for judicial review that are dismissed as moot, the petitioners' petitions for judicial review are dismissed because of their failure to participate in the administrative proceedings.

## I. BACKGROUND

Congress declared it to be the policy of the United States that "the subsoil and seabed of the outer Continental Shelf [(OCS)] appertain to the United States and are subject to its jurisdiction, control, and power of disposition as provided in [OCSLA]." 43 U.S.C. § 1332(1). Further, the OCS "is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." *Id.* § 1332(3). The DOI is authorized and required to "administer the provisions of [OCSLA] relating to the leasing of the [OCS]" for mineral exploration and development and to "prescribe such rules and regulations as may be necessary to carry out such provisions." *Id.* § 1334(a). The DOI "is authorized to grant to the highest responsible qualified bidder or bidders by competitive bidding, under regulations promulgated in advance, any oil and gas lease on submerged lands of the [OCS]*." Id.* § 1337(a)(1).

Under OCSLA, as amended in 1978, the development of an offshore oil well must be pursued by a lease purchaser or mineral lessee in four distinct administrative stages. *See Sec'y of the Interior v. California*, 464 U.S. 312, 336-37 (1984). The four stages are: "(1) formulation of a five year leasing plan by the Department of the Interior; (2) lease sales; (3) exploration by the lessees; (4)

4

Nos. 10-60411 et al.

development and production. Each stage involves separate regulatory review that may, but need not, conclude in the transfer to lease purchasers of rights to conduct additional activities on the OCS. And each stage includes specific requirements for consultation with Congress, between federal agencies, or with the States." *Id.* at 337.

The present case involves only the third and fourth stages: exploration and development and production. The first two stages — the five year leasing plan and lease sales — are not at issue here. The Court in *Secretary of the Interior* described the pertinent exploration and development and production stages as follows:

"*(3) Exploration.* The third stage of OCS planning involves review of more extensive exploration plans submitted to Interior by lessees. 43 U.S.C. § 1340 (1976 ed., Supp. III). Exploration may not proceed until an exploration plan has been approved. A lessee's plan must include a certification that the proposed activities comply with any applicable state management program developed under [the Coastal Zone Management Act (CZMA)]. OCSLA expressly provides for federal disapproval of a plan that is not consistent with an applicable state management plan unless the Secretary of Commerce finds that the plan is consistent with CZMA goals or in the interest of national security. 43 U.S.C. § 1340(c)(2) (1976 ed., Supp. III). The plan must also be disapproved if it would 'probably cause serious harm or damage . . . to the marine, coastal, or human environment. . . .' 43 U.S.C. §§ 1334(a)(2)(A)(i), 1340(c)(1) (1976 ed., Supp. III). If a plan is disapproved for the latter reason, the Secretary may 'cancel such lease and the lessee shall be entitled to compensation. . . .' 43 U.S.C. § 1340(c)(1) (1976 ed., Supp. III). . . ." 464 U.S. at 339 (alterations in original).

"*(4) Development and production.* The fourth and final stage is development and production. 43 U.S.C. § 1351 (1976 ed., Supp. III). The lessee must submit another plan to Interior. The Secretary must forward the plan to

Nos. 10-60411 et al.

the governor of any affected state and, on request, to the local governments of affected states, for comment and review.  43 U.S.C. §§ 1345(a), 1351(a)(3) (1976 ed., Supp. III).  Again, the governor's recommendations must be accepted, and the local governments' may be accepted, if they strike a reasonable balance between local and national interests.  Reasons for accepting or rejecting a governor's recommendations must be communicated in writing to the governor.  43 U.S.C. § 1345(c) (1976 ed., Supp. III).  In addition, the development and production plan must be consistent with the applicable state coastal management program.  The State can veto the plan as 'inconsistent,' and the veto can be overridden only by the Secretary of Commerce.  43 U.S.C. § 1351(d) (1976 ed., Supp. III).  A plan may also be disapproved if it would 'probably cause serious harm or damage . . . to the marine, coastal or human environments.'  43 U.S.C. § 1351(h)(1)(D)(i) (1976 ed., Supp. III).  If a plan is disapproved for the latter reason, the lease may again be cancelled and the lessee is entitled to compensation. 43 U.S.C. § 1351(h)(2)(C) (1976 ed., Supp. III)."  464 U.S. at 340 (alterations in original).

"Congress has thus taken pains to separate the various federal decisions involved in formulating a leasing program, conducting lease sales, authorizing exploration, and allowing development and production.  Since 1978, the purchase of an OCS lease, standing alone, entails no right to explore, develop, or produce oil and gas resources on the OCS.  The first two stages are not subject to consistency review; instead, input from State governors and local governments is solicited by the Secretary of Interior.  The last two stages invite further input from governors or local governments, but also require formal consistency review.  States with approved CZMA plans retain considerable authority to veto inconsistent exploration or development and production plans put forward in those latter stages.  The stated reason for this four part division was to forestall premature litigation regarding adverse environmental effects that all agree will

6

Nos. 10-60411 et al.

flow, if at all, only from the latter stages of OCS exploration and production."
*Id.* at 340-341 (footnote omitted).

## II. JURISDICTION

### A.    Standing and Mootness

"Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750 (1984). "All of the doctrines that cluster about Article III — not only standing but mootness, ripeness, political question, and the like — relate in part, and in different though overlapping ways, to an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government." *Id.* (quoting *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1178–1179 (D.C. Cir. 1983) (Bork, J., concurring) (internal quotation marks omitted)).  "The Art[icle] III doctrine that requires a litigant to have 'standing' to invoke the power of a federal court is perhaps the most important of these doctrines." *Id.*  Accordingly, before we reach the merits of any claim, we must first assure ourselves that the petitioners have standing to bring their claims and that the claims are not moot.

### 1.

The petitioners have standing to proceed in this case. The DOI and the intervenors do not contend otherwise.  The standard for organizational standing is as follows:

> An association has standing to bring a suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members.

*Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000) (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129

Nos. 10-60411 et al.

F.3d 826, 827-28 (5th Cir. 1997)). The individual members of an organization have standing to sue in their own right if "(1) they have suffered an actual or threatened injury; (2) the injury is 'fairly traceable' to the defendant's action; and (3) the injury will likely be redressed if the plaintiffs prevail in the lawsuit." *Id.* at 792 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Friends of the Earth, Inc. v. Crown Cent. Petroleum*, 95 F.3d 358, 360 (5th Cir.1996)).

Each of the petitioners satisfies the requirements for organizational standing. First, their individual members have standing to sue in their own right. The organizations have submitted declarations and affidavits from their members, describing their research, economic, recreational, and esthetic interests in the Gulf of Mexico and the surrounding area, including its wildlife, ecosystems, coastal lines, and beaches. For instance, one member is a photographer who specializes in conservation photography, and whose subject matter would be impaired by damage to the area. Another member owns a kayaking tour company and relies on the waters of the Gulf of Mexico being safe in order to continue attracting customers. Threats to these interests, which the petitioners argue are posed by the DOI's approval of plans for exploration, as well as development and production without properly accounting for their environmental impact, as required by OCSLA and NEPA, are cognizable as injuries for the purposes of standing. *See Medina Cnty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 691 n.4 (5th Cir. 2010) ("[The petitioner's] contentions as to esthetic and pecuniary harm are in fact sufficient to support standing." (citing *Defenders of Wildlife*, 504 U.S. at 563; *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586-87 (5th Cir. 2006))).

These injuries are also "fairly traceable" to the DOI's approvals of various plans regarding deepwater drilling in the Gulf of Mexico, especially because energy companies are required to seek agency approval at each of the four stages of developing an offshore oil well. *Cf. Sierra Club v. Glickman*, 156 F.3d 606,

8

Nos. 10-60411 et al.

614 (5th Cir. 1998) (explaining that although the United States Department of Agriculture lacked "coercive control" over third party farmers, its ability to offer incentives to those farmers, and the effect of those incentives, were sufficient to show that the petitioners' injuries were "fairly traceable" to the agency). In a similar context, the District of Columbia Circuit has recognized causation and redressability in a case also brought under OCSLA. *See Ctr. for Biological Diversity v. Dep't of the Interior*, 563 F.3d 466, 479 (D.C. Cir. 2009) ("Petitioners have shown, solely for the sake of an Article III standing analysis, that [DOI's] adoption of an irrationally based Leasing Program [under OCSLA] could cause a substantial increase in the risk to their enjoyment of the animals affected by the offshore drilling, and that our setting aside and remanding of the Leasing Program would redress their harm.").

Additionally, the individual members satisfy the requirement of redressability. In a case such as this, where the petitioners are suing to require the DOI to comply with the procedures of OCSLA and NEPA, they "need not show that the procedural remedy that [they are] requesting will in fact redress [their] injur[ies]," although they "must nonetheless show that there is a possibility that the procedural remedy will redress [their] injur[ies].'" *Sierra Club*, 156 F.3d at 613. "In order to make this showing, the [petitioners] must show that 'the procedures in question are designed to protect some threatened concrete interest of [theirs] that is the ultimate basis of [their] standing.'" *Id.* (quoting *Defenders of Wildlife*, 504 U.S. at 573 n.8). Here, the interests asserted by the petitioners are among those that both NEPA and OCSLA were designed to protect. *See* 43 U.S.C. § 1332(3) ("It is hereby declared to be the policy of the United States that . . . the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, *subject to environmental safeguards*, in a manner which is consistent with the maintenance of competition

9

Nos. 10-60411 et al.

and other national needs." (emphasis added)); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886 (1990) ("We have no doubt that 'recreational use and aesthetic enjoyment' are among the sorts of interests those statutes [NEPA and another federal statute] were specifically designed to protect." (emphasis removed)).

In addition to the individual members having standing to bring suit in their own right, the litigation is germane to the purposes of each organization. The Sierra Club is a nonprofit organization that uses litigation and advocacy to promote environmental causes, and has about 57,000 members in states bordering the Gulf of Mexico; the Gulf Restoration Network is a not-for-profit environmental advocacy organization that advocates for protecting and restoring the Gulf of Mexico's natural resources; and the Center is a nonprofit organization that advocates for environmental causes, especially those linked to preserving a diversity of animal and plant species.

Finally, the participation of individual members is not needed to proceed in this litigation; the claims asserted and the relief sought by the petitioners are not particular to any individual. Because neither the claims nor the relief "require[] individualized proof," they "are thus properly resolved in a group context." *Hunt*, 432 U.S. at 344.

In sum, we conclude that the petitioners have standing to bring their requests for judicial review.

**2.**

However, four of the sixteen petitions challenging plan approvals are moot. Here, the parties agree that the petitions challenging the following four plans are moot: Plan R-5019 was superseded by another plan, R-5037; Plan N-9503 was cancelled; Plan S-7409 was superseded by another plan, Plan R-5081; and Plan N-9509 was superseded by another plan, Plan R-5089. Thus, we dismiss the petitions for judicial review as to those plans.

Nos. 10-60411 et al.

We also conclude that a fifth petition, challenging Plan N-9438, is not moot. The DOI submits that this petition is moot because the plan has been cancelled. But as the Center points out, the DOI concedes that there is no written or signed order cancelling this plan. Absent a showing that the plan has actually been cancelled, we conclude that the petition challenging the approval is not moot.

## B.    Appellate Jurisdiction

Next, we determine whether we have statutory appellate jurisdiction to judicially review the DOI actions challenged by the petitioners. Subsections 1349(c)(2) and (3) of OCSLA provide:

> (c)    Review of Secretary's approval of leasing program; review of approval, modification or disapproval of exploration or production plan; persons who may seek review; scope of review; certiorari to Supreme Court
>
> . . . .
>
> (2)    Any action of the Secretary to approve, require modification of, or disapprove any exploration plan or any development and production plan under this subchapter shall be subject to judicial review only in a United States court of appeals for a circuit in which an affected State is located.
>
> (3)    The judicial review specified in paragraphs (1) and (2) of this subsection shall be available only to a person who (A) participated in the administrative proceedings related to the actions specified in such paragraphs, (B) is adversely affected or aggrieved by such action, (C) files a petition for review of the Secretary's action within sixty days after the date of such action, and (D) promptly transmits copies of the petition to the Secretary and to the Attorney General.

43 U.S.C. § 1349(c)(2), (3).

11

Nos. 10-60411 et al.

## 1. Section 1349(c)(2)

The petitioners seek judicial review of the DOI's approval of nine exploratory plans (EPs) under OCSLA in this court of appeals for the circuit in which the allegedly affected state of Louisiana is included. OCSLA provides that "[a]ny action of the [DOI] to approve. . . any exploration plan . . . shall be subject to judicial review only in a United States court of appeals for a circuit in which an affected State is located." 43 U.S.C. § 1349(c)(2). Thus, insofar as the DOI's actions in approving the nine EPs are concerned, § 1349(c)(2) clearly subjects them to our appellate jurisdiction and judicial review, contingent upon other applicable OCSLA conditions.

The petitioners also seek judicial review of the DOI's approval of three "Development Operations Coordination Documents" (DOCDs). It is not obvious without further study that a DOCD approval is subject to our judicial review under § 1349(c)(2) as is the DOI's approval of any "development and production plan" (DPP) under OCSLA. However, after considering the pertinent OCSLA provisions, their purpose and legislative history, as well as the DOI's regulations adopted pursuant to OCSLA, we conclude that a DOCD is a modified form of a DPP, the DOI's approval, modification, or disapproval of which is subject to judicial review only in the courts of appeals.

Because most OCS oil and gas development has occurred in the Gulf of Mexico offshore Louisiana and Texas, "[t]he long-standing nature and sheer volume of development led Congress and the regulatory agencies to impose different, generally less stringent requirements on some aspects of operations" in the Western Gulf of Mexico.[4] For example, § 1351 of OCSLA exempts leases

---

[4] Robert B. Wiygul, *The Structure of Environmental Regulation on the Outer Continental Shelf: Sources, Problems, and the Opportunity for Change*, 12 J. Energy Nat. Resources & Envtl. L. 75, 85 (1992). The Gulf of Mexico is divided into the Eastern Gulf of Mexico and the Western Gulf of Mexico. 30 C.F.R. § 250.105 (2011). The Eastern Gulf of Mexico consists of "all OCS areas of the Gulf of Mexico . . . [that] are adjacent to the State of

Nos. 10-60411 et al.

in the Gulf of Mexico from some of the detailed requirements imposed by § 1351 in the remainder of the OCS, except those areas offshore of Florida.[5]  Careful examination of all OCSLA provisions and their legislative history clearly indicates that Congress did not intend, however, to exempt development and production by lessees in the Western Gulf of Mexico from regulation by other provisions of OCSLA and by valid regulations adopted by the DOI.  To the contrary, these sources evince a legislative intent to authorize the DOI, by valid regulations, to impose anywhere in the OCS all reasonable development and production conditions it deems necessary to its stewardship of the OCS and administration of OCSLA.  *See* 43 U.S.C. §§ 1334, 1351; H.R. Rep. 95-1474, at 115 (1978) (Conf. Rep.); *see also* Gulf of Mexico Exemption from Sec. 25 of the Outer Continental Shelf Lands Act, as Amended, 87 Interior Dec. 544 (1980); Oil & Gas & Sulphur Operations in the Outer Continental Shelf, 48 Fed. Reg. 55,565 (Dec. 14, 1983).

Pursuant to this authority, the DOI requires that, before conducting any development and production activities on a lease or unit in the Western Gulf of Mexico, the lessee must submit and obtain the DOI's approval of a Development Operations Coordination Document (DOCD). 30 CFR § 250.201(a) (2011). Elsewhere in the OCS, the DOI requires submission and approval of a Development and Production Plan (DPP) before such activities may commence. *Id.*; *see also id.* § 250.241 (2011) (a submitted "DPP or DOCD must include": a "[d]escription, objectives, and schedule," information about "[t]he location and water depth of each of [the lessee's] proposed wells and production facilities"; a "description of the drilling unit and associated equipment"; a description of the "[p]roduction facilities"; and a "[s]ervice fee").  Moreover, both DOCDs and DPPs

Florida."  *Id.*  The Western Gulf of Mexico consists of "all OCS areas of the Gulf of Mexico *except* those . . . [which] are adjacent to the state of Florida."  *Id.* (emphasis added).

[5] *See* 43 U.S.C. § 1351(l).

Nos. 10-60411 et al.

must meet the same basic criteria: for either type of plan, the lessee must demonstrate that it "ha[s] planned and [is] prepared to conduct the proposed activities in a manner that: (a) Conforms to OCSLA, applicable implementing regulations, lease provisions and stipulations, and other Federal laws; (b) Is safe; (c) Conforms to sound conservation practices and protects the rights of the lessor; (d) Does not unreasonably interfere with other uses of the OCS, including those involved with national security or defense; and (e) Does not cause undue or serious harm or damage to the human, marine, or coastal environment." *Id.* § 250.202 (2011). Similarly, the DOI will disapprove a DPP or DOCD if it determines that

> because of exceptional geological conditions, exceptional resource values in the marine or coastal environment, or other exceptional circumstances that all of the following apply:
>
> (1) Implementing your DPP or DOCD would cause serious harm or damage to life (including fish and other aquatic life), property, any mineral deposits (in areas leased or not leased), the national security or defense, or the marine, coastal, or human environment;
>
> (2) The threat of harm or damage will not disappear or decrease to an acceptable extent within a reasonable period of time; and
>
> (3) The advantages of disapproving your DPP or DOCD outweigh the advantages of development and production.

*Id.* § 250.271(d) (2011).

Moreover, the language used in agency documents also suggests that the DOI views DOCDs essentially as a lesser included form of DPPs. *See* 53 Fed. Reg. 10596, 10,608-09 (explaining the decision to retain the DOCD requirement under a section entitled "Subpart B—Exploration and Development and Production Plans); *Id.* at 10,704 (explaining, in promulgating the regulation, that "[a]ny reference in this part to a Development and Production Plan shall be

14

Nos. 10-60411 et al.

considered to include the Development Operations Coordination Document used in the western Gulf of Mexico.").

The adoption of the foregoing regulations by the DOI is consistent with the legislative history indicating that Congress, by § 1349(c,) sought to provide a streamlined judicial review of the agency's approval, modification or disapproval of all plans for exploration as well as development and production, based on the agency's administrative record. *See* H.R. Rep. 95-590 at 162 (explaining that § 1349(c) provides for judicial review of a more limited nature by having petitions for review of certain DOI actions proceed directly to the courts of appeals). Pursuant to that purpose and intent, OCSLA provides that the DOI's actions approving, modifying or disapproving exploration or development and production plans shall be subject to judicial review only by the courts of appeals, 43 U.S.C. § 1349(c)(2); that any such action by the DOI "shall only be subject to review pursuant to the provisions of this subsection, and shall be specifically excluded from citizen suits which are permitted pursuant to [§ 1349(a)]," *id.* § 1349(c)(4); that the DOI "shall file in the appropriate court the record of any public hearings required by this subchapter and any additional information upon which the [agency] based [its] decision, as required by [28 U.S.C. § 2112]," and that "[s]pecific objections to the action of the [DOI] shall be considered by the court only if the issues upon which such objections are based have been submitted to the [DOI] during the administrative proceedings related to the actions involved," 43 U.S.C. § 1349(c)(5); and that "[t]he court of appeals conducting a proceeding pursuant to this subsection shall consider the matter under review solely on the record made before the [DOI]," and "[t]he findings of the [DOI], if supported by substantial evidence on the record considered as a whole, shall be conclusive," *id.* § 1349(c)(6).

For these reasons, we conclude that the DOI's approval, modification, or disapproval of a DOCD is subject to judicial review by the appropriate court of

Nos. 10-60411 et al.

appeals in accordance with 43 U.S.C. § 1349(c)(2)-(7). It would conflict with the statutory and administrative purpose and intent to anomalously conclude that the DOI's approvals, modifications, and disapprovals of DOCDs are not subject to judicial review only in the courts of appeals, in the same manner as are the DOI's actions with respect to EPs and DPPs. Accordingly, we conclude that we have jurisdiction of the petitioners' requests for judicial review of the DOI's approvals of the three DOCDs, as well as its approvals of the nine EPs.

## 2. Section 1349(c)(3)(A)

The DOI and the intervenors contend, however, that our jurisdiction to review the DOI's approval of any of the nine EPs and three DOCDs is ousted by § 1349(c)(3)(A), which provides that judicial review shall be available only to a person who participated in the administrative proceedings related to the actions specified in § 1349(c)(2), because none of the petitioners participated in any of the proceedings related to the approval of those plans. The petitioners respond that § 1349(c)(3)(A) is not a jurisdictional limitation, but rather is a jurisprudential provision requiring that they exhaust their administrative remedies before seeking judicial review, a requirement from which we should excuse them under the circumstances of this case. We agree with the petitioners that § 1349(c)(3)(A) is a non-jurisdictional, claim-processing or exhaustion requirement; however, because we conclude that the petitioners cannot be excused or excepted from the consequences of their failure to satisfy that provision in this case, their petitions will be dismissed.

## a. Section 1349(c)(3)(A) is not jurisdictional

"'Jurisdiction' refers to 'a court's adjudicatory authority.'" *Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1243 (2010) (quoting *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004)). "Accordingly, the term 'jurisdictional' properly applies only to 'prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction)' implicating that authority." [*Kontrick*,

Nos. 10-60411 et al.

540 U.S. at 455]; *see also Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 89 (1998) ('subject-matter jurisdiction' refers to 'the courts' statutory or' constitutional *power* to adjudicate the case' (emphasis in original)); *Landgraf v. USI Film Products*, 511 U.S. 244, 274 (1994) ('[J]urisdictional statutes "speak to the power of the court rather than to the rights or obligations of the parties"' (quoting *Republic Nat. Bank of Miami v. United States*, 506 U.S. 80, 100 (1992) ([Thomas], J., concurring)))." *Reed Elsevier*, 130 S. Ct. at 1243.

"In light of the important distinctions between jurisdictional prescriptions and claim-processing rules," *id.* at 1244, the Supreme Court has "encouraged federal courts and litigants to 'facilitat[e]' clarity by using the term 'jurisdictional' only when it is apposite," *id.* (quoting *Kontrick*, 540 U.S. at 455) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)). In *Arbaugh*, the Supreme Court explained its approach to distinguishing jurisdictional prescriptions from other requirements, such as claims-processing rules:

> If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue. But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.

*Arbaugh*, 546 U.S. at 515-16 (citation and footnote omitted).

"The plaintiff in *Arbaugh* brought a claim under Title VII of the Civil Rights Act of 1964, which makes it unlawful 'for an employer . . . to discriminate,' *inter alia*, on the basis of sex. *Reed Elsevier*. 130 S. Ct. at 1244 (quoting 42 U.S.C. § 2000e-2(a)(1)). "But employees can bring Title VII claims only against employers that have 'fifteen or more employees.'" *Id.* (quoting 42 U.S.C. § 2000e(b)). The question in *Arbaugh* was "whether that employee numerosity requirement 'affects federal-court subject-matter jurisdiction or, instead, delineates a substantive ingredient of a Title VII claim for relief.'" *Id.*

17

Nos. 10-60411 et al.

(quoting *Arbaugh*, 546 U.S. at 503). The Supreme Court concluded that "it does the latter." *Id.*

The *Arbaugh* Court's "holding turned principally on [its] examination of the text of § 2000e(b), the section in which Title VII's numerosity requirement appears. Section 2000e(b) does not 'clearly stat[e]' that the employee numerosity threshold on Title VII's scope 'count[s] as jurisdictional.'" *Id.* (second and third alterations in original) (quoting *Arbaugh*, 546 U.S. at 515-16 & n.11). "And nothing in [the Court's] prior Title VII cases compelled the conclusion that even though the numerosity requirement lacks a clear jurisdictional label, it nonetheless imposed a jurisdictional limit." *Id.* (citing *Arbaugh*, 546 U.S. at 511-13). "Similarly, § 2000e(b)'s text and structure did not demonstrate that Congress 'rank[ed]' that requirement as jurisdictional." *Id.* (alteration in original) (citing *Arbaugh*, 546 U.S. at 513-16). The Court noted that "the employee numerosity requirement is located in a provision 'separate' from § 2000e-5(f)(3), Title VII's jurisdiction-granting section, distinguishing it from the 'amount-in-controversy threshold ingredient of subject-matter jurisdiction . . . in diversity-of-jurisdiction under 28 U.S.C. § 1332. *Id.* (alteration in original) (quoting *Arbaugh*, 546 U.S. at 514-15). The Court concluded that "the numerosity requirement could not fairly be read to 'speak in jurisdictional terms or in any way refer to the jurisdiction of the district courts.'" *Id.* (quoting *Arbaugh*, 546 U.S. at 515, in turn quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982)) (some internal quotation marks omitted). Therefore, the Court "'refrain[ed] from' construing the numerosity requirement to 'constric[t] § 1331 or Title VII's jurisdictional provision.'" *Id.* (alterations in original) (quoting *Arbaugh*, 546 U.S. at 515) (internal quotation marks omitted).

Following the Supreme Court's instruction, we "now apply this same approach," *id.*, to § 1349(c)(3)(A), which states:

The judicial review specified in paragraphs (1) and (2) of this subsection shall be available only to a person who (A) participated in the administrative proceedings related to the actions specified in such paragraphs . . . .

Considering first whether  § 1349(c)(3)(A) "clearly states" that its participation requirement is "jurisdictional," *see Arbaugh*, 546 U.S. at 515, we conclude that it clearly does not.  Additionally, § 1349(c)(3)(A)'s participation requirement, "like Title VII's numerosity requirement, is located in a provision 'separate' from those granting federal courts subject-matter jurisdiction over . . . claims." *Reed Elsevier*, 130 S. Ct. at 1245-46 (quoting *Arbaugh*, 546 U.S. at 514-15).  Federal courts of appeals have subject-matter jurisdiction to review the DOI's approval, modification, or disapproval of plans submitted at the exploration or development and production stage.  43 U.S.C. § 1349(c)(2).  But § 1349(c)(2) does not "condition its jurisdictional grant," *see id.* at 1246, on whether a person seeking such judicial review has participated in the administrative proceedings related to the challenged DOI action.  *See Reed Elsevier*, 130 S. Ct. at 1246 (citing *Arbaugh*, 546 U.S. at 515, for the proposition that "'Title VII's jurisdictional provision'" does not "'specif[y] any threshold ingredient akin to 28 U.S.C. § 1332's monetary floor.'").

And, as in *Reed Elsevier*, "[n]or does any other factor suggest that [§ 1349(c)(3)(A)'s participation requirement] can be read to 'speak in jurisdictional terms or refer in any way to the jurisdiction of the' federal courts.'" *See id.* (quoting *Arbaugh*, 546 U.S. at 515, in turn quoting *Zipes*, 455 U.S. at 394) (internal quotation marks omitted).  "A statutory condition that requires a party to take some action before filing a lawsuit is not automatically "'a *jurisdictional* prerequisite to suit.'"  *Id.* (quoting *Zipes*, 455 U.S. at 393).  "Rather, the jurisdictional analysis must focus on the 'legal character' of the requirement, which must be discerned by looking to the condition's text, context, and relevant historical treatment." *id.* (citations omitted) (quoting *Zipes*, 455 U.S. at 395). The

Nos. 10-60411 et al.

Court "similarly ha[s] treated as nonjurisdictional other types of threshold requirements that claimants must complete, or exhaust, before filing a lawsuit." *Id.* at 1246-47.[6]

"Plainly read, *Arbaugh* and [the Court's other precedents] point to the conclusion that [§1349(c)(3)(A)] is nonjurisdictional." *See id.* at 1251 (Ginsburg, J., concurring in part and concurring in the judgment). Similar to other provisions that the Supreme Court has concluded are nonjurisdictional, § 1349(c)(3)(A) "does not speak in jurisdictional terms or refer in any way to the jurisdiction of the federal courts." *See id.* As in *Reed Elsevier*, we determine that "*Arbaugh*'s 'readily administrable bright line' is therefore controlling," *id.*, and that §1349(c)(3)(A) is nonjurisdictional.[7]

---

[6] *See also id.* at 1247 n. 6 (citing *Jones v. Bock*, 549 U.S. 199, 211 (2007), as "treating the administrative exhaustion requirement of the Prison Litigation Reform Act of 1995 (PLRA) — which states that no action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted,' 42 U.S.C. § 1997e(a) — as an affirmative defense[, rather than a jurisdictional requirement,] even though '[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court')" (first and third alterations in original), and *Woodford v. Ngo*, 548 U.S. 81, 93 (2006), for the same). Furthermore, insofar as the §1349(c)(3)(A) participation requirement establishes an affirmative defense, it is clear that in this case the DOI and the intervenors did not waive or forfeit that defense, but raised it timely and fully at the first opportunity in this court. *See Kontrick*, 540 U.S. at 459-60 (holding that debtor forfeited right to rely on affirmative defense where he did not raise it before the bankruptcy court reached the merits of the creditor's objection).

[7] We note that under this court's precedents, we would reach the same conclusion that § 1349(c)(3)(A) is not jurisdictional. As we have explained, "one important factor in deciding whether [a statutory requirement is jurisdictional] is whether the statute explicitly mentions and deprives federal courts of jurisdiction if administrative remedies are not exhausted." *Dawson Farms, LLC v. Farm Serv. Agency*, 504 F.3d 592, 605 (5th Cir. 2007). If the statute explicitly mentions and deprives federal courts of jurisdiction unless the statutory requirement is met, the statute is jurisdictional. *Id.* In contrast, where the statute "focuses on the individual litigant and does not expressly deprive the courts of jurisdiction if the individual litigant fails to exhaust administrative remedies," it is jurisprudential rather than jurisdictional. *Id.* at 605-06. Here, the provision states that "judicial review . . . shall be available only to a person who participated in the administrative proceedings . . . ." 43 U.S.C. § 1349(c)(3)(A). This language clearly focuses on individual litigants and what they must do to obtain judicial review, rather than courts and their jurisdiction. *See Dawson Farms,* 504

Nos. 10-60411 et al.

### b. Excuse for failure to participate

The petitioners argue that because §1349(c)(3)(A) is nonjurisdictional, this court can and should, under the circumstances here, find an exception or excuse for their failure to participate in the administrative proceedings, vacate the DOI's approval of the plans involved, and remand the plans to the DOI for further proceedings. In support of this argument, the petitioners contend that the DOI, which used its agency website and Office of Public Information to make the public versions of EPs and DOCDs available to the public, placed the information in an obscure location on its website, making it difficult to find. Moreover, they submit, for some of the plans, the DOI placed the public versions on the website in an untimely manner. Worse, they contend, for some plans, the DOI did not make the public versions available at all, either on its website or elsewhere.

"Under ordinary principles of administrative law a reviewing court will not consider arguments that a party failed to raise in timely fashion before an administrative agency." *Sims v. Apfel*, 530 U.S. 103, 114-15 (2000) (Breyer, J., dissenting) (citing *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 36-37 (1952); *Unemployment Compensation Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155 (1946); *Hormel v. Helvering*, 312 U.S. 552, 556-57 (1941); 2 K. Davis & R. Pierce, Administrative Law Treatise § 15.8, pp. 341-44 (3d ed. 1994)). Furthermore, the Supreme Court, in *Sims,* unanimously agreed that "in most cases, an issue not presented to an administrative decisonmaker cannot be argued for the first time in federal court." *Id.* at 112 (O'Connor, J., concurring in part and concurring in the judgment) ("On this underlying principle of administrative law, the Court is unanimous.") (citing the majority and the dissent). "As the Court explained long ago:

---

F.3d at 605-06.

21

Nos. 10-60411 et al.

'[O]rderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts. . . . [C]ourts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.'

*Id.* at 115 (Breyer, J., dissenting ) (quoting *L.A. Tucker Truck Lines*, 344 U.S. at 37).

This ordinary rule has exceptions, but is especially important when made mandatory by a specific statute requiring exhaustion of remedies or issues. *See, e.g., Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the [Prison Litigation Reform Act, as provided for by 42 U.S.C. § 1997e(a)]."); *Rafeedie v. I.N.S.*, 880 F.2d 506 (D.C. Cir. 1989) (Ginsburg, J., concurring) ("As I see it, a statutory exhaustion requirement, unless Congress explicitly declares otherwise, does not impose an absolute, unwaivable limitation on judicial review; instead, it sets a condition that may be excused when insistence on exhaustion would threaten grave harm to the party seeking review and would not sensibly serve the purposes Congress envisioned in establishing that condition. In other words, a statutory exhaustion requirement ordinarily functions as a tighter restraint than the judge-made rule, but is not an utterly unbreachable barrier."); *see also Henderson v. Shinseki*, 131 S. Ct. 1197, 1206 (2011) (explaining that although "the deadline for filing a notice of appeal with the Veterans Court does not have jurisdictional attributes . . . . [it] is nevertheless an important procedural rule," and remanding for consideration of "[w]hether this case falls within any exception to the rule").

Section 1349(c)(3)(A), the judicial review provision applicable here, specifically states that judicial review "shall be available only to a person who participated in the administrative proceedings related to the actions" of the DOI about which he or she complains. 43 U.S.C. § 1349(c)(3)(A). Moreover, § 1349(c) further explicitly defines the exhaustion requirement as well as the scope and

limits of our judicial review by providing that: the DOI's actions "shall only be subject to review pursuant to the provisions of this subsection, and shall be specifically excluded from citizen suits which are permitted pursuant to subsection (a) of this section," *id.* § 1349(c)(4); "[s]pecific objections to the action of the [DOI] shall be considered by the court only if the issues upon which such objections are based have been submitted to the [DOI] during the administrative proceedings related to the actions involved," *id.* §1349(c)(5); and "[t]he court of appeals conducting a proceeding pursuant to this subsection shall consider the matter under review solely on the record made before the [DOI]," *id.* § 1349(c)(6).

The petitioners have not argued or shown that any "established exception" to this explicitly defined statutory "exhaustion" or "waiver" rule applies. *Sims*, 530 U.S. at 115 (Breyer, J., dissenting); s*ee, e.g., Bethesda Hospital Ass'n v. Bowen*, 485 U.S. 399, 406-07 (1988) (exhaustion would be futile); *Mathews v. Eldridge*, 424 U.S. 319, 329, n. 10 (1976) (petitioner brings constitutional claims). This court has also explained that "exceptions [to administrative exhaustion] apply . . . only in extraordinary circumstances" and that "[t]here are limited bases for excusing administrative exhaustion." *Dawson Farms, LLC v. Farm Serv. Agency*, 504 F.3d 592, 606 (5th Cir. 2007) (quoting *Cent. States Se. & Sw. Areas Pension Fund v. T.I.M.E.-DC, Inc.*, 826 F.2d 320, 329 (5th Cir. 1987)) (internal quotation marks omitted)).

> Traditional circumstances in which courts have excused a claimant's failure to exhaust administrative remedies include situations in which (1) the unexhausted administrative remedy would be plainly inadequate, (2) the claimant has made a constitutional challenge that would remain standing after exhaustion of the administrative remedy, (3) the adequacy of the administrative remedy is essentially coextensive with the merits of the claim (e.g., the claimant contends that the administrative process itself is unlawful), and (4) exhaustion of administrative remedies would be futile because the administrative agency will clearly reject the claim.

*Id.* (quoting *Taylor v. U.S. Treasury Dep't.*, 127 F.3d 470, 477 (5th Cir. 1997)) (internal quotation marks omitted).  A court may also excuse the failure to exhaust where "irreparable injury will result absent immediate judicial review." *Id.*; *see also Ace Prop. & Cas. Ins. Co.*, 440 F.3d 992, 1000 (8th Cir. 2006) ("A party may be excused from exhausting administrative remedies . . . if exhaustion would cause irreparable harm . . . .").

Rather than attempting to show that the present case falls within an "established exception," the petitioners argue that the circumstances of this case call upon us to recognize a new exception: They contend that their failures to participate in the administrative proceedings were caused by the DOI's untimely, "obscure" and "difficult to find" postings of the public versions of the plans on the internet; and that they therefore should be excused from the statutory requirement that they must have participated in the proceedings in order to challenge the DOI's approvals of the plans and to subject them to judicial review.  Assuming, without deciding, that we have the authority to recognize such an exception or excuse, we will not do so in this case because the petitioners have not demonstrated that their failure to participate in the administrative proceedings was caused by the DOI's actions or omissions.

In response to the petitioners' claims, we asked the parties to submit supplemental letter briefs concerning (1) what information, especially public versions of plans, is made available in the agency's Office of Public Information; (2) when that information is made available; and (3) how one accesses the office and the information it makes available.  In response, the agency attached to its initial letter brief the declaration of Michele Daigle, the agency Chief of the Office of Information Management Services for the Gulf of Mexico Region.  Ms. Daigle stated in her declaration that:

> The Office of Public Information [OPI] is located in . . . New Orleans, Louisiana and has operating hours of 8:00 a.m. to 4:00 p.m., Monday through Friday.  Four full-time employees work in the

Nos. 10-60411 et al.

OPI and provide help, service, and information to members of the public who are free to access the OPI during its operating hours. The OPI is equipped with three computers, each with a dedicated printer, and three copy machines which are available for the public's use.

Ms. Daigle explained that "[t]he three computers in the OPI can be used by the public to access the [agency] website," and thus to access documents made available on that website, but that "[i]f . . . members of the public need assistance in accessing the documents, OPI employees are available to help them. OPI employees can also be reached by telephone . . . , if members of the public need off-site assistance."

Additionally, Ms. Daigle provided this court with a chart regarding the plans at issue.[8]

| Plan Control Number[9] | Date Public Version of Plan Was Posted on Agency Website | Date of Approval |
|---|---|---|
| S-7409 | 4/21/2010 | 4/27/2010 |
| S-7399 | 4/21/2010 | 4/16/2010 |
| N-9481 | 1/29/2010 | 4/1/2010 |
| N-9483 | 1/29/2010 | 3/30/2010 |
| S-7387 | 2/25/2010 | 3/29/2010 |
| R-5019 | not posted pursuant to 30 C.F.R. § 250.285(c) (2011) | 3/31/2010 |

---

[8] We recognize that in this section, we are dealing only with the remaining twelve plans which are not moot. However, we have included information regarding all sixteen plans, in order to provide a complete picture.

[9] Plans beginning with "N" are initial plans; those beginning with "R" are revised plans; and those beginning with "S" are supplemental plans.

Nos. 10-60411 et al.

| R-5021 | not posted pursuant to 30 C.F.R. § 250.285(c) (2011) | 5/3/2010 |
|--------|------------------------------------------------------|----------|
| R-5037 | not posted pursuant to 30 C.F.R. § 250.285(c) (2011) | 4/21/2010 |
| S-7391 | 3/9/2010 | 4/29/2010 |
| S-7402 | 4/23/2010 | 5/14/2010 |
| S-7408 | 4/21/2010 | 4/21/2010 |
| S-7413 | 4/23/2010 | 4/23/2010 |
| N-9438 | 10/1/2009 | 5/18/2010 |
| N-9503 | 3/31/2010 | 4/21/2010 |
| N-9507 | 3/31/2010 | 4/26/2010 |
| N-9509 | 4/6/2010 | 5/20/2010 |

Ms. Daigle said that the public versions of plans are posted in the following manner: in addition to submitting "proprietary copies of its EP, DPP, or DOCD," a company seeking agency approval must also submit "eight copies of such documents for public distribution." The agency then makes the plans available in a database on its website, the Public Information Data System.

However, "*supplemental* EPs, DPPs, and DOCDs," (emphasis added) as well as "*revised* EPs, DPPs, and DOCDs," (emphasis added) are not required to be posted and follow procedures that typically apply to the approval process for EPs, DPPs, and DOCDs, unless the agency "determines [that the plans] are likely to result in a significant change in the impacts previously identified and evaluated" in the initial plan. 30 C.F.R. § 250.285(c) (2011). In this case, Ms. Daigle explained, the agency determined that pursuant to that regulation, certain revised plans were *not* likely to result in a significant change, and thus did not post the public versions of those plans.

Nos. 10-60411 et al.

The petitioners do not contest the facts set forth in Ms. Daigle's declaration or the chart attached. Thus, the petitioners do not contest that the plans were posted on the DOI website and were available through the Office of Public Information as described by Ms. Daigle. The Center, however, argues that the DOI may not "rel[y] on a *post hoc*" declaration rather than the administrative record for the proposition that it did not post certain revised plans pursuant to 30 C.F.R. § 250.285(c) (2011). However, the authorities that the Center cites do not prevent our considering the parties' letter briefs in determining whether the DOI's actions or omissions caused the petitioners' failure to participate in the administrative proceedings.[10] Further, the petitioners have not expressly alleged or argued that they actually tried without success to access the plans at issue on the DOI website, or through visits or communications with personnel at the DOI's Office of Public Information. Also, computer searches by this court's attorneys after this case was submitted indicate that a reasonably qualified attorney or other researcher should have been able to find public versions of plans on the DOI's website containing information about particular plans pending before the DOI.

---

[10] *Matter of Bell Petroleum Services, Inc.*, 3 F.3d 899 (5th Cir. 1993), dealt with the review of an agency action on its merits, and in that context the court explained that it would "not accept the [agency's] post-hoc rationalizations in justification of its decision." *Id.* at 905. Here, we are not reviewing the merits of the DOI's agency actions in approving EPs and DOCDs. At this juncture, assuming arguendo that we could recognize an exception or excuse from §1349(c)(3)(A)'s provision that judicial review shall be available only to a person who participated in the administrative proceedings, we are considering whether the petitioners would be entitled to such an excuse or exception. In *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667 (1986) the Court referred to the "strong presumption that Congress intends judicial review of administrative action," *id.* at 670, in holding that in neither 42 U.S.C. § 1395ff (1982 ed. and Supp. II) nor § 1395ii (1982 ed., Supp. II), had Congress barred judicial review of regulations promulgated under Part B of the Medicare program. That presumption does not prevent Congress from adopting rules requiring exhaustion of administrative remedies before a litigant may seek judicial review of an agency's actions. *See, e.g., Henderson v. Shinseki*, 131 S.Ct. 1197, 1206 (2011) (explaining that although "the deadline for filing a notice of appeal with the Veterans Court does not have jurisdictional attributes[,] [t]he 120-day limit is nevertheless an important procedural rule.").

Nos. 10-60411 et al.

The DOI's performance in the proceedings prior to its approval of the plans was by no means flawless. Of the twelve plans dealt with in this section, the DOI approved two on the same day that their public versions were posted on the internet; and in one instance the agency approved the plan before it had been posted. The petitioners' showing in this case, however, does not persuade us that they would have participated in those proceedings had there been more time between the postings and the approval of the plans. In respect to the clear majority of the plans at issue, there was ample time between the posting and the DOI's approval of the plan for a diligent interested party to participate in the administrative proceedings. Moreover, the petitioners have failed to offer any evidence or persuasive argument that the DOI's actions or omissions, rather than their own inattention or unpreparedness, caused their failure to participate in any of the administrative proceedings. Consequently, even if we were convinced that we have equitable powers to create an exception to § 1349(c)(3)'s mandatory statutory requirement that judicial review shall be available only to a person who participated in the administrative proceedings, we conclude that the petitioners have not shown that they would be entitled to such an excuse from the rule in this case.

The petitioners' reliance on *Bowen v. City of New York*, 476 U.S. 467 (1986), *Consolidated Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003), and *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 550 (D.C. Cir. 1983) is misplaced. None of these precedents controls our decision here.

In *Bowen*, the Supreme Court held that the application of an illegal, secret, internal policy by the Secretary of Health and Human Services in adjudicating Social Security Act claims equitably tolled the limitations periods for seeking judicial review and waived the exhaustion of administrative remedies. *Id.* at 480-86. Moreover, the Court upheld the district and appellate

28

Nos. 10-60411 et al.

courts' finding that the harm caused by the wrongful denials of disability claims was irreparable. *Id.* at 484. The Court stated: "These claimants stand on a different footing from one arguing merely that an agency incorrectly applied its regulation. Rather, the District Court found a systemwide, unrevealed policy that was inconsistent in critically important ways with established regulations." *Id.* at 485.

In the present case, the petitioners have made no showing that the DOI applied an illegal, clandestine, internal policy, such as the district court in *Bowen* found that the agency there had pursued after a seven day trial. Instead, the petitioners present legal argument only, viz., in effect, that the agency incorrectly applied its regulation. As the Supreme Court in *Bowen* indicated, that is not a unique situation that justifies a court in tolling limitations periods or waiving statutory exhaustion of remedy requirements. Moreover, the petitioners do not even contend that the well-established irreparable injury exception to the requirement to exhaust administrative remedies applies in this case.

In *Consolidated Bearings*, the Federal Circuit rejected the government's argument that Consolidated had failed to exhaust its administrative remedies, stating that the "record in this case does not disclose any statutory or regulatory provision that allows a party to challenge the manner in which [the agency] implements the final results of an administrative review," and, therefore, "[w]ithout an administrative procedure to exhaust, this court holds that Consolidated did not violate the exhaustion doctrine." 348 F.3d at 1004. Contrary to the petitioners' argument, however, neither *Consolidated Bearing*'s holding nor its language is applicable to the present case. Here, 43 U.S.C. § 1349 sets forth the statutory provisions that allow litigants to subject the DOI's approval of exploration plans and development and production plans to judicial review, § 1349(c)(2), and the rule that requires that they must first exhaust their

29

Nos. 10-60411 et al.

administrative remedies by participating in the administrative proceedings related to the DOI's actions which they seek to challenge, § 1349(c)(3). Thus, unlike the situation in *Consolidated Bearings*, here there was a statutory vehicle by which the petitioners could have challenged the DOI's actions if they had met the statutory requirement of exhaustion of remedies by participating in the administrative proceedings. And, as explained above, the agency had a system for placing public versions of plans on its website, and provided assistance to those navigating the website via the Office of Public Information. In other words, *Consolidated Bearings* is the inapposite obverse of the present case and therefore has no bearing here.

In *Small Refiner Lead Phase-Down Task Force*, the District of Columbia Circuit held that, under the Administrative Procedures Act (APA) and the Clean Air Act, which required the EPA to issue a "proposed rule" before issuing a final regulation and to give a detailed explanation of its reasoning at the "proposed rule" stage of a regulation as well as at the final rule stage, the EPA's regulation was invalid due to the lack of adequate notice given to small refiners affected by the regulation. 705 F.2d at 548-51. That case is clearly inapposite here. The present case does not involve rulemaking at all, much less the stringent rulemaking procedures required by the Clean Air Act or the APA.

The petitioners have not shown that, under OCSLA, the DOI's actions or omissions caused their failure to participate in the administrative proceedings, as required by §1349(c)(3), in order to subject the DOI's approval of the plans involved here to judicial review. For these reasons we conclude that, if we could recognize an exception to §1349(c)(3)(A)'s requirement that judicial review shall be available only to a person who participated in the pertinent administrative proceeding, the petitioners have not shown that they are entitled to such an exception or excuse in this case.

Nos. 10-60411 et al.

### c. The Center's letter

The Center also argues that a letter dated May 18, 2010, signed by its Oceans Program Director, Miyoko Sakashita, addressed to the Secretary of the Interior, the Director of the Minerals Management Service, and the Gulf of Mexico Regional Director of the MMS, constituted its "participation" in the administrative proceedings involved in this case "to the maximum extent practicable."[11]   The letter "urges the Secretary to rescind the Department of Interior's policy of categorically excluding drilling plans from thorough environmental review under the National Environmental Policy Act ('NEPA')." (citing Department of Interior Manual 516 DM 15.4(C)(10)). "Additionally," the letter further urges, "the Secretary should rescind all approvals of (1) exploration plans ('EPs') and (2) Development Operations Coordination Documents ('DOCDs') for offshore drilling in the Gulf of Mexico that the Minerals Management service (hereinafter, 'MMS' or 'the Secretary') categorically excluded pursuant to the Department's policy and have not yet been implemented."  The letter proceeds to criticize the Secretary's "policy" and past practices of approving "drilling activities" as "categorically excluded from NEPA review" as "arbitrary when it was adopted."  "Moreover," the letter states that "in light of the *Deepwater Horizon* spill, this policy is now wholly untenable. Accordingly the Secretary has violated and continues to violate the spirit and the letter of NEPA."  The letter continues with a detailed discussion of the Gulf of Mexico ecosystem; the emerging effects of the *Deepwater Horizon* oil spill; the use of categorical exclusions from NEPA review in the Gulf of Mexico; and why, especially "[i]n light of the *Deepwater Horizon* oil spill," the categorical exclusion policy and approvals of drilling plans in the Gulf of Mexico under that policy should be rescinded.  In its conclusion, the letter states:

---

[11] According to Ms. Sakashita's declaration, the letter was sent on May 18, 2010 to the named addressees.

31

The only lawful, responsible course of action open to MMS in light of the Deepwater Horizon disaster and the agency's scandalous track record is to rescind the categorical exclusion policy as it applies to drilling plans, and rescind all EP and DOCD approvals that have been issued under [categorical exclusions] which have not yet been implemented.  These approvals were issued in violation of NEPA, the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§1331 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§551 *et seq.*  Under OCSLA, the statute that dictates MMS's offshore oil and gas exploration and development permitting program, MMS may only permit offshore oil and gas activities that fully comply with NEPA. 43 U.S.C. § 1866(a).  Moreover, these activities may only be permitted if they are "subject to environmental safeguards." 43 U.S.C. § 1332(3). MMS may suspend oil and gas activities when doing so is necessary to conduct environmental analyses or otherwise fulfill NEPA requirements. 30 C.F.R. § 250.172(d); *see also id.* at 250.172(b) (providing for suspension of operations when "activities pose a threat of serious, irreparable, or immediate harm or damage. . . . includ[ing] a threat to life (including fish and other aquatic life) . . . or the marine, coastal, or human environment.").  In this case, MMS has not only the authority but the irrefutable responsibility to prevent another disaster like the *Deepwater Horizon* explosion and spill by immediately suspending Gulf of Mexico drilling activities authorized via CEs, rescinding all such approvals, and undertaking thorough NEPA review for all such proposals.

(second, third, and fourth alteration in original).

Without intimating any view as to the merits of the criticism that the Center levels at the DOI's approval of EPs and DOCDs in the Gulf of Mexico, we interpret the writing as a thorough condemnation of the DOI's policy and past practices, and not as an act of participating in any individual ongoing proceeding in which a lessee is seeking the DOI's approval of an EP or DOCD.  The letter does not specify by name or number any particular proposed exploratory or development plan, but instead calls upon the DOI to "rescind" all plans that have been approved and not yet implemented; it does not state that the Center intends or desires to participate in any particular ongoing or anticipated

proceeding; and it does not urge the DOI to disapprove of any EP or DOCD which has not yet been acted upon. Accordingly, we do not think the Center's letter can fairly be interpreted to amount to participation in the administrative proceedings related to an action by the DOI on a particular EP or DOCD under 43 U.S.C. § 1349(c)(3).

## CONCLUSION

For these reasons, four of the petitioners' petitions for judicial review are dismissed as moot, and their remaining twelve petitions are dismissed because of their failure to participate in the administrative proceedings.