# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

August 30, 2019

Lyle W. Cayce
Clerk

No. 18-60102

CENTER FOR BIOLOGICAL DIVERSITY; GULF RESTORATION
NETWORK; LOUISIANA BUCKET BRIGADE,

> Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; ANDREW
WHEELER, in his official capacity as Administrator of the United States
Environmental Protection Agency; ANNE IDSAL, Region 6 Administrator,

> Respondents.

Petition for Review of an Order of the
Environmental Protection Agency

Before JONES, HO, and OLDHAM, Circuit Judges.

ANDREW S. OLDHAM, Circuit Judge:

Petitioners claim a recent EPA permit will lead to increased pollution in the Gulf of Mexico.  But Petitioners lack standing, so we lack jurisdiction.  The petition for review is dismissed.

## I.

The Clean Water Act ("CWA") prohibits the "discharge [of] any pollutant from any point source without [a National Pollutant Discharge Elimination System] permit." *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 928 (5th Cir. 1998) (citing 33 U.S.C. § 1311(a)).  EPA is authorized to issue such permits, including general permits for "a whole category or subcategory of point

No. 18-60102

sources." *Id.* at 929; *see also* 33 U.S.C. § 1342(a). Here, EPA issued a general permit for various oil and gas operations "located in and discharging to Federal waters . . . in the Central to Western portions of the Gulf of Mexico." The General Permit "establishes effluent limitations, prohibitions, reporting requirements, and other conditions on discharges."

Three environmental organizations—the Center for Biological Diversity, the Gulf Restoration Network, and the Louisiana Bucket Brigade—petitioned this Court to review EPA's grant of the General Permit. They claim EPA violated federal law in three ways. First, they argue EPA violated the National Environmental Policy Act ("NEPA") by failing to prepare an adequate Environmental Impact Statement ("EIS"). Second, they argue EPA violated the CWA by issuing the General Permit without adequate consideration of certain factors established by regulation. Third, they argue EPA violated the CWA by omitting certain monitoring requirements from the Permit. For relief, Petitioners ask this Court to "remand the General Permit to Region 6 of EPA for further proceedings."

Petitioners attempted to prove their standing by submitting declarations from both members and organizational leaders. Petitioners' opening brief, however, addressed standing only in a footnote. Although EPA initially agreed Petitioners had standing, Intervenor American Petroleum Institute argued otherwise. Petitioners then advanced their standing arguments at greater length in their reply brief. By letter, we asked counsel to be prepared to discuss standing at oral argument. At argument, EPA conceded the Intervenor "raised some very serious questions about" Petitioners' standing. Oral Arg. 23:40–23:48. The questions are more than serious; they require dismissal of the petition.

2

No. 18-60102

## II.

Like a plaintiff who files a complaint, a petitioner who seeks review of agency action "invok[es] federal jurisdiction" and therefore "bears the burden of establishing" standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *see also Massachusetts v. EPA*, 549 U.S. 497, 517–18 (2007).

Petitioners are associations, so their standing turns on the associational standing doctrine. "Associational standing is a three-part test: (1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members." *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

For one of Petitioners' members to "independently meet the Article III standing requirements," *ibid.*, that member must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision," *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quotation omitted).[1] We start with the injury-in-fact requirement and hold Petitioners have not shown that one of their members could independently satisfy it.

## A.

"[T]he first and foremost of standing's three elements" is injury in fact. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quotation omitted). "To

---

[1] Petitioners do not argue they can satisfy the three elements of standing "in [their] own name[s]" based on their own interests as organizations. *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). They submitted three declarations from the organizations' leaders. But those declarations were submitted to satisfy the second and third prongs of the associational-standing test. Because we reject Petitioners' standing on the first prong, we need not consider the evidence regarding the other two prongs.

establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560).

In environmental cases, courts must carefully distinguish between injury to the petitioner and injury to the environment. Article III standing requires injury to the petitioner. Injury to the environment is insufficient. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) ("The relevant showing for purposes of Article III standing, however, is not injury to the environment but injury to the plaintiff.").

The question, then, is what does Article III require of the petitioner who claims injury based on harm to the environment? Sometimes an individual's aesthetic, recreational, and scientific interests provide that link. *See Friends of the Earth*, 528 U.S. at 183 (explaining that lessening of "aesthetic and recreational values" is an injury in fact); *Lujan*, 504 U.S. at 562–63 ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."). But such environmental interests cannot support an injury in fact unless they have been actually harmed or imminently will be. *See Spokeo*, 136 S. Ct. at 1548; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *Lujan*, 504 U.S. at 564 n.2 ("Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." (quotation omitted)).[2] By ensuring a future injury is not "too

---

[2] The Supreme Court's "cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about. In some instances, [the Court has] found standing based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm." *Clapper*, 568 U.S.

speculative," the imminence requirement "reduce[s] the possibility of deciding a case in which no injury would have occurred at all." *Lujan*, 504 U.S. at 564 n.2.

## B.

In this case, the injuries in fact asserted by Petitioners' members depend on at least four conditions:

1.   Discharge:   Operators in the Gulf discharge pollutants, as authorized by the permit.

2.   Geographic Nexus:   The discharges reach areas of the Gulf in which Petitioners' members have interests.

3.   Temporal Nexus:   The discharges are present at a time relevant to Petitioners' members' interests.

4.   Adverse Effect:   The discharges negatively affect Petitioners' members' interests.

*See Clapper*, 568 U.S. at 410 (enumerating the "chain of possibilities" necessary for plaintiffs to suffer a future injury in fact).

With respect to the first condition, the challenged permit specifically authorizes limited discharges to occur.   Even so, the four declarations from Petitioners' members are inadequate.   The first three plainly fail to satisfy the geographic-nexus requirement.   The fourth is more complicated, but it too fails to aver an injury in fact.

## 1.

We start with the declarations of Peter Galvin, Todd Steiner, and Susan Prévost.   Petitioners must show the discharges (assuming they occur) will reach areas of the Gulf in which these individuals have interests.   *See Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) ("[T]o establish standing

---

at 414 n.5.   As in *Clapper*, however, any difference between "certainly impending" and "substantial risk" is immaterial here.   *See ibid.*

plaintiffs must show that they use the area affected by the challenged activity and not an area roughly in the vicinity of a project site." (quotation omitted)); *Lujan*, 504 U.S. at 565–66 (similar); *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 668 (D.C. Cir. 1996) (explaining the need for plaintiffs to demonstrate "a geographic nexus to any asserted environmental injury").    Without a geographic nexus, Petitioners' members cannot suffer an injury in fact.

To show that nexus, Petitioners must point to evidence.  Courts cannot simply presume pollution discharged in one place will affect would-be plaintiffs everywhere.  *See Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 700–01 (5th Cir. 2000) (holding that a member of the Sierra Club could not establish an injury in fact because he could not show waste left in a landfill would reach "the aquifer that supplies his drinking water"); *Fla. Audubon Soc'y*, 94 F.3d at 667 ("In the case of broad rulemaking, a court may not assume that the areas used and enjoyed by a prospective plaintiff will suffer all or any environmental consequences that the rule itself may cause.").

That evidence must show geographic proximity between the plaintiff's interests and the discharges.  The Supreme Court has ruled that "geographic remoteness" forecloses a finding of injury "when no further facts have been brought forward . . . showing that the impact . . . in those distant places will in some fashion be reflected" where the plaintiffs are.  *Lujan*, 504 U.S. at 567 n.3. This means petitioners cannot simply assert some interest somewhere within a large geographic area.  The Court emphasized it must "assure itself that" members of the plaintiff associations "plan to make use of *the specific sites*" where environmental effects would allegedly be felt.  *Summers*, 555 U.S. at 499 (emphasis added).  Thus, plans to visit unspecified national forests did not suffice to challenge government action affecting only portions of the national

forests because "[t]he national forests occupy more than 190 million acres, an area larger than Texas." *Id.* at 465.

Our sister circuits have correctly applied the geographic-nexus requirement. For example, the Seventh Circuit held it could not assume that pollution discharged in one area would necessarily be felt elsewhere in a large body of water: "[T]he water bodies at issue span, in some cases, hundreds of miles. For instance, the Rio Grande runs the entire length of New Mexico, and pointing to [evidence of] discharges into the Rio Grande does not establish an injury to the portion of the river used by the affiant." *Tex. Indep. Producers & Royalty Owners Ass'n v. EPA* (*TIPROA*), 410 F.3d 964, 973 (7th Cir. 2012). By contrast, in *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271 (11th Cir. 2015), the Eleventh Circuit found an environmental group had standing to challenge a general permit. *Id.* at 1279. That's because the group's "members attest[ed] that they use waters downstream from mining sites," and those waters were "visibly polluted" from upstream discharges. *Id.* at 1280.

Here, the Galvin, Steiner, and Prévost declarations fail under *Summers* and *TIPROA*. Because Petitioners are seeking prospective relief, we focus on their members' planned future activities in the Gulf, not their past activities. *See Lujan*, 504 U.S. at 564 (holding that past visits to an affected area "prove[d] nothing" for standing purposes because "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief" (quotation omitted)). Here are the locations of their future planned activities:

- Galvin declares that he has "specific plans to visit Alabama and the western Gulf Coast in October of this year and to visit . . . Florida and the eastern Gulf Coast near Tampa and surrounding areas next February to enjoy the natural environment and the opportunities to see the diverse wildlife of the region."

- Steiner "plan[s] to visit the Gulf Coast at least twice in" the near future and spend "time viewing and photograph[ing] wildlife and snorkeling." Although the declaration does not specify, the visits may be to Galveston or elsewhere in "the western Gulf of Mexico."

- Prévost lives in New Orleans, annually visits Grand Isle, and is "in the process of relocating to a second home in Belle Chasse, Louisiana."

Having established where Galvin, Steiner, and Prévost have interests, we turn to determining where the discharges will occur. Petitioners say "[t]he General Permit authorizes discharges from oil and gas facilities operating in federal waters in the Western and Central portions of the Gulf of Mexico (i.e., waters off the coasts of Texas and Louisiana)." But they are no more specific than that. Petitioners have not pointed to the specific locations of the relevant facilities in the Gulf.

A geographic area as big as the "Western and Central portions of the Gulf" cannot support Article III standing. *See Summers*, 555 U.S. at 499. The Gulf is huge. It covers about 600,000 square miles, and it contains more than 640 quadrillion gallons of water. Moreover, we do not know how widely water currents might transport any pollutants. An EPA document in the record says that the Gulf's "[c]irculation patterns" include both offshore and inshore circulation systems, and those, in turn, "involve the dynamic interaction of a variety of factors." And apparently those factors—including wind, weather, and tides, among others—vary across the Gulf and throughout the year. Thus, Galvin, Steiner, and Prévost do not provide nearly enough information to infer, with any degree of certainty, that any discharges will geographically overlap with their interests.[3]

---

[3] *Gulf Restoration Network v. Salazar*, 683 F.3d 158 (5th Cir. 2012), is not to the contrary. In that case, the Court found an injury in fact because individuals' business and professional interests were threatened by oil and gas activities permitted by the defendant. *See id.* at 167. The Court alluded to evidence in the record but did not detail how that

8

2.

Petitioners also rely on evidence from a fourth declarant, Jonathan Henderson. Henderson "ha[s] lived in the Gulf area [his] whole life." Like the previous three declarants, Henderson uses the Gulf in typical ways. For example, Henderson swims, fishes, and boats in the Gulf multiple times per year. Any argument for standing based on these activities fails for the reasons discussed above.

But Henderson also does something the other declarants do not: He has "spent a considerable amount of time in boats and planes monitoring the offshore oil and gas industry and tracking oil spills." On these trips he "search[es] for . . . oil leaks in the Gulf of Mexico—including [in] the areas where there are offshore oil and gas platforms in federal waters." He has "more boat trips and flyovers planned for later in the year." Petitioners argue Henderson will suffer aesthetic injuries from pollution during his future boat trips and flyovers.

With respect to the geographic-nexus requirement, Henderson's allegations are much closer to the Article III minimum. On the one hand, he does not aver that he plans boat trips and flyovers to the platforms that are operating under the General Permit. On the other hand, his declaration appears to say that wherever the relevant platforms are, he intends to find them. We are unaware of any precedent allowing a petitioner to show the geographic nexus in this way. And we decline to create it today. Instead, we

---

evidence established an injury in fact—an understandable approach given that standing was undisputed. *See id.* at 166–67. As a result, *Gulf Restoration Network* does not provide guidance regarding what kind of evidence suffices to show standing. That's probably why our Court has never cited the case for a standing proposition. *Cf.* BRYAN A. GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT 81 (2016) (noting the difficulty of "extracting a rule or standard" to be applied in future cases from an opinion that "doesn't lay out all the facts [the court] took into account in reaching its decision").

assume without deciding that Henderson has satisfied the geographic-nexus requirement.

His declaration is nonetheless insufficient for two independent reasons. First, he has not satisfied the temporal-nexus requirement. No evidence suggests Henderson's boat trips and flyovers will coincide with the timing of discharges. Whether he will view any discharges depends on multiple factors, including how often Henderson makes these trips, how often platforms discharge pollutants, and how long the discharges have noticeable effects on the water in those areas before evaporating or dissipating. Petitioners have provided none of this information. Without evidence that Henderson's trips to platforms will occur at times when discharges are visible (or otherwise noticeable), we cannot conclude Henderson will ever view such discharges. Henderson cannot affirm that he will ever see pollution from wells drilled pursuant to the permit, so he cannot claim injury that is imminent or certainly impending. There is no temporal nexus sufficient for standing.

Second, Henderson cannot show any adverse effect. That's because someone who goes looking for pollution cannot claim an aesthetic injury in fact from seeing it. Of course, when a person visits an area for aesthetic purposes, pollution interfering with his aesthetic enjoyment may cause an injury in fact. *See Friends of the Earth*, 528 U.S. at 183. But crucial to an aesthetic injury is that the aesthetic experience was actually offensive to the plaintiff. *See Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 21 (D.C. Cir. 2011) (distinguishing a plaintiff who had standing because viewing animals in inhumane conditions actually "injured his aesthetic sense" from a plaintiff who lacked standing because he "did not have the personal attachment he claimed and did not, as he claimed, suffer from the elephants' mistreatment"). A person cannot manufacture standing by voluntarily setting

aside potential aesthetic interests (like viewing a pristine expanse of ocean) to pursue an incompatible interest (like viewing oil spills).  *See New England Anti-Vivisection Soc'y v. U.S. Fish & Wildlife Serv.*, 208 F. Supp. 3d 142, 175 (D.D.C. 2016) (holding any aesthetic injury from seeing mistreatment of animals was self-inflicted if the plaintiff's "presence at the place that he says will injure him aesthetically is not *compelled* (e.g., someone who does not live or work in the vicinity, nor has any history of traveling there, and is not otherwise required to be there)").

This is in keeping with the general rule that "standing cannot be conferred by a self-inflicted injury."  *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018); *see also Clapper*, 568 U.S. at 416 (holding litigants "cannot manufacture standing merely by inflicting harm on themselves").  As the Second Circuit has recognized, this rule applies with equal force in environmental cases.  *See Mancuso v. Consol. Edison Co. of N.Y.*, 25 F. App'x 12, 13 (2d Cir. 2002) (finding no injury in fact to "aesthetic sensibilities" when a plaintiff visited an area "to obtain evidence to support [an environmental] lawsuit").

When Henderson searches for oil spills, he is not pursuing "esthetic purposes" that are then lessened by pollution.  *Lujan*, 504 U.S. at 562.  He is pursuing his interest in locating pollution, and seeing pollution means he has succeeded in locating it.  As a result, Henderson's successful efforts to locate aesthetically displeasing pollution cannot serve as the basis for an aesthetic injury in fact.

3.

Our decision in *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546 (5th Cir. 1996), is not to the contrary.  Petitioners say *Cedar Point*

recognizes standing whenever a petitioner's "members use[] the waterbodies into which the pollution is discharged." That's wrong.

In *Cedar Point*, we analyzed standing to bring a CWA citizen suit for pollution from the defendant's drilling activities. We discussed a three-part test used by the Third Circuit: The plaintiffs had to demonstrate the defendant:

> (1) discharged some pollutant in concentrations greater than allowed by its permit (2) into a waterway in which the plaintiffs have an interest that is or may be adversely affected by the pollutant and that (3) the pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs.

*Id.* at 557 (quoting *Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 (3d Cir. 1990)). The Court found all three requirements were satisfied. *See id.* at 558.

But the *Cedar Point* plaintiffs had better evidence of a geographic nexus. One affiant established an "interest in that *part* of Galveston Bay around Cedar Point's discharge" by showing he "canoed and participated in educational trips in the vicinity of Cedar Point's discharge." *Ibid.* (emphasis added). We cautioned future litigants against a "literal reading of [the Third Circuit's decision in] *Powell Duffryn*." Such a reading would require plaintiffs to show merely "an interest in the 'waterway' into which the defendant is discharging a pollutant." *Id.* at 558 n.24. We noted that could "produce results incongruous with our usual understanding of the Article III standing requirements." *Ibid.* We specifically emphasized that "some 'waterways' covered by the CWA may be so large that plaintiffs should rightfully demonstrate a more specific geographic or other causative nexus" to establish standing. *Ibid.* The Gulf of Mexico is such a body of water.

No. 18-60102

4.

One final note on injury in fact:  In their reply brief, Petitioners claim to have suffered "informational injuries from EPA's inadequate environmental review under NEPA."  Petitioners did not adequately brief this issue.  Their opening brief listed "recreational, aesthetic, vocational, scientific, and other interests" allegedly threatened by pollution.  But it never mentioned anything about an informational injury stemming from the allegedly inadequate EIS.  As a result, neither EPA nor the Intervenor had the opportunity to brief the issue.  And even then, Petitioners' reply brief includes only a single sentence about their alleged informational injuries.  They cite no record evidence and only two cases, neither of which considered whether an allegedly inadequate EIS creates informational injuries.

Arguments in favor of standing, like all arguments in favor of jurisdiction, can be forfeited or waived.  *See Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 544 (10th Cir. 2016) (considering "only those arguments in favor of standing that the plaintiffs have adequately briefed"); *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008) (explaining "arguments in favor of subject matter jurisdiction can be waived by inattention or deliberate choice"); *Morse v. Ozark Cty.*, 609 F. App'x 359, 361 (8th Cir. 2015) (declining to consider arguments in favor of jurisdiction first raised in a reply brief).  Petitioners forfeited their informational-injury argument by failing to include it in their opening brief.  *See Estate of Duncan v. Comm'r*, 890 F.3d 192, 202 (5th Cir. 2018).[4]

---

[4] We have been reluctant to treat Petitioners' standing arguments as forfeited in this case.  Petitioners arguably forfeited all of them by limiting their jurisdictional argument to a single footnote of their opening brief.  *See United States v. Bennett*, 874 F.3d 236, 243 n.9 (5th Cir. 2017).  But we overlook Petitioners' decision to include only a cursory discussion of standing because we assume they had a good-faith (though mistaken) belief that standing would be both undisputed and easy to resolve.  We cannot, however, similarly forgive

No. 18-60102

III.

Even if Petitioners could show injury, they could not meet another of Article III's standing requirements: traceability. Article III demands that there be "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (quotation omitted). Thus, Petitioners must show a causal connection between EPA's allegedly unlawful conduct and their members' asserted injuries.

Petitioners urge us to "relax[]" their causation obligations because this is a procedural-rights case under NEPA. It is true, procedural-rights cases are different: When a petitioner challenges an administrative agency's failure to satisfy a procedural requirement—like NEPA's EIS requirement—"the primary focus of the standing inquiry is not the imminence or redressability of the injury to the plaintiff, but whether a plaintiff who has suffered personal and particularized injury has sued a defendant who has caused that injury." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc). Judge Sentelle explained the rule in the canonical procedural-rights case:

> As in all cases, standing in an EIS suit requires adequate proof of causation. The conceptual difficulty with this requirement, in this type of case, is that an adequate causal chain must contain at least two links: one connecting the omitted EIS to some substantive government decision that may have been wrongly decided because of the lack of an EIS and one connecting that substantive decision to the plaintiff's particularized injury.

*Id.* at 668.

---

Petitioners' forfeiture of their informational-injury argument. Completely omitting a theory of injury is different from cursorily supporting one, especially when that omission is combined with the cursory treatment of the theory in Petitioners' reply brief.

14

Petitioners must therefore establish a causal chain with at least two links:

A.    A link connecting the alleged legal violation to the issuance of the General Permit, and

B.    A link connecting the issuance of the General Permit to the discharges behind their members' injuries.

*See ibid.*

A.

For the first link, Petitioners must show "that the procedural step was connected to the substantive result." *Am. Rivers v. FERC*, 895 F.3d 32, 42 (D.C. Cir. 2018) (quotation omitted); *see also Lujan*, 504 U.S. at 573 n.8 (explaining an individual can enforce a procedural right in court "so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing"). That connection means fixing the alleged procedural violation could cause the agency to "change its position" on the substantive action. *Sierra Club v. FERC*, 827 F.3d 59, 67 (D.C. Cir. 2016); *see also Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 83 (D.C. Cir. 1991) (explaining a typical NEPA plaintiff demonstrates standing by showing, *inter alia*, "that if the agency prepared an impact statement (and considered it) before implementing its plans, it might change its mind and thereby avert the damage to [the plaintiff's] interests").

Petitioners have made this showing. One purpose of an EIS is to "ensure[] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *DOT v. Pub. Citizen*, 541 U.S. 752, 768 (2004) (quotation omitted). And in this case, it is undisputed that the information contained in a different EIS could cause EPA to "change its position" on the General Permit. *Sierra Club*, 827 F.3d at 67; *see Lujan*, 504 U.S. at 572 n.7.

No. 18-60102

B.

But showing the allegedly inadequate EIS was causally connected to the issuance of the General Permit is not sufficient. A procedural-rights plaintiff also "must establish that the injury is fairly traceable to the proposed government action or inaction." *Sierra Club v. Glickman*, 156 F.3d 606, 613 (5th Cir. 1998); *see Fla. Audubon Soc'y*, 94 F.3d at 668. Thus, assuming a connection between the EIS and EPA's issuance of the General Permit, Petitioners still must show a connection between the issuance of the General Permit and their assumed injuries. *See Renal Physicians Ass'n v. HHS*, 489 F.3d 1267, 1279 (D.C. Cir. 2007) ("[T]he [procedural-rights] plaintiff must still show that the agency action was the cause of some redressable injury to the plaintiff."); *Fla. Audubon Soc'y*, 94 F.3d at 669 (requiring a "causal connection between the substantive government action and the asserted injury to the plaintiff's particularized interest").[5]

Petitioners must demonstrate that the pollutants that will cause their assumed injuries will be discharged pursuant to the General Permit, and not pursuant to some other authority or in violation of law. *See Clapper*, 568 U.S. at 410–11. In *Clapper*, the plaintiffs asserted an injury in fact from the

---

[5] This is consistent with the general rule that the standing requirements are modified, but not eliminated, in procedural-rights cases. For example, a plaintiff "who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for . . . immediacy." *Lujan*, 504 U.S. at 572 n.7. As a result, a plaintiff could have standing to challenge the "failure to prepare an [EIS]" for a dam construction project "even though the dam will not be completed for many years." *Ibid.* But even if the injury will not occur *immediately*, it still must occur *eventually*. *Ibid.*; *see also Summers*, 555 U.S. at 496 ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."); *City of Hearne v. Johnson*, 929 F.3d 298, 302 (5th Cir. 2019) (holding that a "procedural injury" must "impact a[] concrete interest" to provide standing). That's why the procedural-rights analysis does not affect our injury-in-fact holding in Part II, *supra*. Petitioners failed to show not only that their members would be injured immediately but also that their members would be injured eventually.

government intercepting their communications for surveillance purposes. But they could "only speculate as to whether any (asserted) interception would be under [the statute they challenged] or some other authority." *Id.* at 413. As a result, they failed to "satisfy the 'fairly traceable' requirement." *Ibid.* The same requirement applies in environmental cases. As the Fourth Circuit explained in *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149 (4th Cir. 2000) (en banc), "[i]n applying the 'fairly traceable' requirement, some distinction, of course, must be made between plaintiffs who lie within the discharge zone of a polluter and those who are so far downstream that their injuries cannot fairly be traced to that defendant." *Id.* at 162.

Take for example *Cedar Point*. There were many "entities discharging chemicals into Galveston Bay," and the plaintiffs could not "show to a scientific certainty that the defendant's effluent, and the defendant's effluent alone, caused the precise harm suffered by the plaintiffs." *Cedar Point*, 73 F.3d at 558 (quotation omitted). But the plaintiffs introduced "expert testimony that [the defendant's] produced water was typical in many respects, and that typical produced water has harmful effects on water quality and marine life." *Ibid.* They could thus show that the defendant "contribute[d] to the pollution that impair[ed] [the affiant's] use of the bay." *Ibid.* Our Court then cited *Powell Duffryn*, which explained the same point in more detail: "In order to obtain standing, plaintiffs need not sue every discharger in one action, since the pollution of any one may be shown to cause some part of the injury suffered. The size of the injury is not germane to standing analysis." *Powell Duffryn*, 913 F.2d at 72 n.8.

In other words, if each incremental discharge of pollution makes the plaintiff's injury worse—even just a little worse—then the plaintiff might be able to demonstrate causation for the marginal injury. *See Massachusetts*, 549

U.S. at 524 (rejecting the "assumption that a small incremental step, because it is incremental, can never be attacked in a federal judicial forum," and explaining steps that "whittle away" at "massive problems" satisfy the causation requirement); *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 793 (5th Cir. 2000) (holding an injunction preventing some of the pollution affecting the plaintiff could be appropriate even if the injunction would "not prevent all discharges of the pollutants affecting the plaintiff").

This is the same interpretation of *Cedar Point* that we adopted in *Friends of the Earth, Inc. v. Crown Central Petroleum Corp.*, 95 F.3d 358 (5th Cir. 1996). There we considered standing to challenge a refinery's discharges into Black Fork Creek. But the plaintiff's members did not use Black Fork Creek. They "use[d] a body of water located three tributaries and 18 miles 'downstream' from" the refinery. *Id.* at 361. We distinguished *Cedar Point* for the same reason we distinguish it today: The *Cedar Point* affiant used "the specific area of the Bay in which unlawful discharges occurred," and that "played an important role in our [*Cedar Point*] decision." *Ibid.* In *Crown Central*, by contrast, the plaintiff "and its members relied solely on the truism that water flows downstream and inferred therefrom that any injury suffered downstream is 'fairly traceable' to unlawful discharges upstream." *Ibid.* *Crown Central* rejected that inference: "At some point this common sense observation becomes little more than surmise. At that point certainly the requirements of Article III are not met." *Ibid.*

Taken together, *Cedar Point* and *Crown Central* establish this lesson: Whether a court can infer a causal link between a source of pollution and at least some portion of a petitioner's injury is a fact-specific inquiry that turns on many factors, including the size of the waterway, the proximity of the source

and the injury, forces like water currents, and whether discharges will evaporate or become diluted. *See Crown Central*, 95 F.3d at 361–62. In a case involving a small body of water, close proximity, well-understood water currents, and persistent discharges, *Cedar Point* might be appropriate. *See Cedar Point*, 73 F.3d at 557. But in cases missing one or more of those elements, *Crown Central* prohibits us from inferring that a discharge in one place will necessarily affect a plaintiff's interest in another place. *See, e.g.*, *Crown Central*, 95 F.3d at 361.

Here, the closest Petitioners come to alleging a causal connection is in Steiner's declaration: "I spend time in the western Gulf of Mexico in the same areas that will be directly affected by wastewater discharges from offshore oil and gas activities." Unfortunately, we know relatively little about what Steiner meant. That sentence is unsupported by citation, unexplained in the rest of the declaration, and unmentioned in Petitioners' briefing. He does not explain what the "same area" is. And he says nothing about what "directly affected" means. Article III demands more than such conclusory assertions. *See TIPROA*, 410 F.3d at 973 (holding that "[r]epeating the conclusory allegations of a complaint is not enough" to establish standing).

\* \* \*

Because Petitioners lack standing, we do not reach the merits of their claims. Some may find that unsatisfying. But the standing doctrine "is not just an empty formality" that we can ignore when a case seems important. *Lujan*, 504 U.S. at 581 (Kennedy, J., concurring in part and concurring in the judgment). The elements of standing go to the very core of judicial power.

Federal courts are vested with the "judicial Power" to resolve "Cases" or "Controversies." U.S. CONST. art. III, § 2. When resolution of a case or controversy requires assessing the lawfulness of an executive regulation,

19

courts do so. *See, e.g., Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 314–15 (2014); *cf. Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("If two laws conflict with each other, the courts must decide on the operation of each."). But when a petitioner lacks standing, the resulting litigation cannot be fairly called "a case or controversy," *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 132 (2011), and the court has no "power to declare the law," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)). "For the federal courts to decide questions of law arising outside of cases and controversies would be inimical to the Constitution's democratic character." *Ariz. Christian Sch. Tuition Org.*, 563 U.S. at 132; *see also Marye v. Parsons*, 114 U.S. 325, 330 (1885). It would improperly transform courts into "roving commissions assigned to pass judgment on the validity of the Nation's laws" and agency actions. *Broadrick v. Oklahoma*, 413 U.S. 601, 610–11 (1973).

In our Government, there are entities that address environmental issues outside of the case-or-controversy constraint. This Court is not one of them. As Judge Sentelle put it many years ago: "The federal judiciary is not a back-seat Congress nor some sort of super-agency." *Fla. Audubon Soc'y*, 94 F.3d at 672.

The petition for review is DISMISSED.