# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 18, 2021

Lyle W. Cayce
Clerk

No. 19-40717

Cameron County Housing Authority; Community Housing & Economic Development Corporation,

*Plaintiffs—Appellants*,

*versus*

City of Port Isabel; City of Port Isabel City Commission; Port Isabel Planning and Zoning Commission,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 1:17-CV-229

Before Smith, Ho, and Oldham, *Circuit Judges*.
Andrew S. Oldham, *Circuit Judge*:

Hurricane Dolly severely damaged a public housing development in Port Isabel, Texas (the "City"). The Cameron County Housing Authority ("CCHA") operated the complex and received conditional grant money to rebuild it. But the grant fell through. CCHA responded by suing the City under the Fair Housing Act ("FHA") and other statutes. The district court dismissed the FHA claims for lack of standing. We affirm.

No. 19-40717

I.

Plaintiff CCHA provides affordable housing to low-income families in Cameron County, Texas. According to its executive director, roughly 99% of its tenants are "Hispanic/Latino." Plaintiff Community Housing & Economic Development Corporation ("CHEDC") is a public facility corporation wholly owned by CCHA (collectively "Plaintiffs"). Prior to 2008, CHEDC owned and CCHA operated the 16-unit Neptune Apartment Complex in Port Isabel, Texas. Then Hurricane Dolly struck the region and rendered the complex uninhabitable. Plaintiffs lacked funds to redevelop the property, so the Neptune Apartments sat vacant for several years.

In April 2014, Plaintiffs applied for a federal disaster-recovery grant through the Lower Rio Grande Valley Development Council ("LRGVDC") to rebuild the Neptune Apartments as a 26-unit complex. LRGVDC approved the project and authorized more than $1.7 million in grant money. But it conditioned the funds on Plaintiffs' ability to begin construction by December 1, 2015.

Plaintiffs failed to perform due diligence on whether their proposed project complied with City zoning requirements. They eventually discovered it did not. So in February 2015—10 months after receiving the grant from LRGVDC—Plaintiffs approached the City and asked for rezoning.

City procedures required Plaintiffs to pass through a two-step process. Plaintiffs began by submitting their rezoning request to the City's Planning and Zoning Commission ("P&Z Commission"). The P&Z Commission would then make a preliminary recommendation and transmit it to the City Commission for a final decision. Only the City Commission could make zoning changes.

The P&Z Commission held a public hearing on Plaintiffs' rezoning request in March 2015. Several Port Isabel residents appeared at the hearing

to voice their opposition. A number of these residents, some of whom were white, expressed concern about the construction of a multi-family, mixed-income housing complex near their single-family homes. After hearing these concerns, the P&Z Commission unanimously recommended denying Plaintiffs' request. P&Z Secretary Ramona Alcantara explained that the Commission's decision was "absolutely not" based on discrimination and noted that "most of the people on the . . . commission are Hispanics." She added that the recommendation was instead "about safety, congestion, density, [and] parking" and that Plaintiffs' 26-unit apartment design "wasn't a good plan for th[e] neighborhood."

Rather than push for the City Commission to approve rezoning over the P&Z Commission's negative recommendation, Plaintiffs thought it better to address the public's opposition directly. They spent the next several months working with nonprofit housing organizations on a community-engagement effort that included knocking on doors, handing out flyers, and meeting with residents and leaders. Based on the feedback they received, Plaintiffs developed a new plan for the Neptune Apartments that reduced the number of units from 26 to 16. LRGVDC approved the plan and reduced funding for the project from $1.7 million to just over $1 million.

Plaintiffs submitted their revised 16-unit plan to the P&Z Commission for consideration at a hearing on June 10, 2015. Before the scheduled hearing, City Manager Jared Hockema spoke with CCHA's executive director Daisy Flores. Flores was unable to answer Hockema's questions about the building's height, setback, parking, and unit sizes — "the same questions that the P&Z [Commission] would be asking her." So Hockema suggested that Flores delay the hearing, "work on her proposal more," and come back with "concrete changes" that would address the P&Z Commission's questions. Flores took Hockema to say that the hearing would be "explosive and embarrassing" if she moved forward, and she decided to cancel it.

Plaintiffs subsequently developed a 16-unit plan that didn't require any rezoning. Flores met with City officials to discuss the plan in September 2015—a mere three months before LRGVDC's December 1 deadline. The City responded that it wouldn't issue the required building permits unless Plaintiffs "reduced the number of units on the Neptune site from 16 to 10." So Plaintiffs came up with a new plan and presented it for LRGVDC's approval. On September 28, LRGVDC sent Flores a letter stating that funding for the project would be reduced by more than $400,000. The letter reiterated that "[t]he project must have closed and have permitting approved by 12/1/15" and informed Flores that "LRGVDC w[ould] need to withdraw [all] funds" if Plaintiffs failed to comply.

Plaintiffs submitted their 10-unit plan to City Building Inspector Larry Ellis on October 28. Ellis joined Hockema and the City Mayor for a meeting with Plaintiffs on November 10. The officials told Plaintiffs at the meeting that the City "would not issue any permits for any multi-family buildings" and "would only issue permits for four single-family houses." So Plaintiffs returned to LRGVDC once more and requested that the organization amend the project to four units. Plaintiffs reported that the City would issue the four building permits later that week.

This time LRGVDC refused. Its executive director told Flores on November 24 that the organization would stand by its prior approval of the 10-unit project as well as the December 1 permitting deadline. Flores responded that Plaintiffs could "not close on the . . . grant award [by] December 1" because "the City of Port Isabel has indicated that they will only approve building permits for four single family houses." December 1 came and went, and LRGVDC never issued the funds. The Neptune project died.

No. 19-40717

Plaintiffs filed this lawsuit against the City, the City Commission, and the P&Z Commission two years later. They asserted violations of the Fair Housing Act and various other federal statutes. The district court granted summary judgment to the City Commission and the P&Z Commission after finding they were not independent entities that could be sued. The district court granted summary judgment to the City after determining that Plaintiffs lacked standing to bring their FHA claims and that their other claims failed on the merits.

Plaintiffs timely appealed. Because they limit their appeal to the district court's dismissal of their FHA claims against the City, the only issue before us is whether Plaintiffs have standing to bring those claims. *See United States ex rel. Drummond v. BestCare Lab'y Servs., L.L.C.*, 950 F.3d 277, 284 (5th Cir. 2020). We review the district court's standing determination de novo. *Williams v. Parker*, 843 F.3d 617, 620 (5th Cir. 2016).

## II.

A plaintiff that "invok[es] federal jurisdiction bears the burden of establishing" standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). The familiar elements of standing are (1) an injury in fact that (2) is fairly traceable to the challenged conduct of the defendant and (3) is likely to be redressed by a favorable judicial decision. *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019) (citing *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018)). Because we are at the summary judgment stage, Plaintiffs "must set forth by affidavit or other evidence specific facts" that create a genuine dispute as to their standing. *Lujan*, 504 U.S. at 561 (quotations omitted); Fed. R. Civ. P. 56(a).

## A.

Injury in fact is the starting point. "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected

interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Ctr. for Biological Diversity*, 937 F.3d at 537 (quotation omitted).

Plaintiffs have taken great care to specify the nature and timing of the injury in this case. Their opening brief describes their injury as an inability to use any federal grant funds to "rebuild[] the Neptune Apartments." Blue Br. 20–21. Their reply brief clarifies that "Plaintiff[s'] claims under the . . . Fair Housing Act were not ripe until December 2015, when Plaintiffs lost the federal grant funds" in their entirety. Grey Br. 12–13. Thus, Plaintiffs do *not* claim injury from the reduction in LRGVDC funding that would've occurred had the City approved their alternative 16- or 10-unit plans. Plaintiffs assert instead that they "did not have a complete and present cause of action" until *all* the funds disappeared on December 1, 2015. *Id.* at 15 (quotation omitted).

Plaintiffs had a reason to frame their injury this way: they needed a theory that would make their November 2017 lawsuit timely under the FHA's two-year statute of limitations. *See* 42 U.S.C. § 3613(a)(1)(A). Focusing on December 1, 2015, gave them a few weeks to spare. What's more, Plaintiffs doubled and then tripled down on their December 1 injury theory at oral argument. This exchange took place during Plaintiffs' top-side argument:

> THE COURT: . . . [W]hat I'm trying to figure out is where exactly does the injury in fact for Article III purposes kick in.
>
> COUNSEL: When the funds go away entirely.
>
> THE COURT: On December 1 is when you get injured?
>
> COUNSEL: Precisely.
>
> THE COURT: So if [the City] had come to you and said "four units is good," and you had said "okay great," and the third-party lender had said "great, we're going to close on four," and you closed on November 30, you wouldn't be injured?

> Counsel: I think that's right, Your Honor. I think that's right. . . .

Oral Argument at 19:34–20:03. And this exchange took place during Plaintiffs' rebuttal:

> The Court: . . . Could your client have sued [in March 2015 after the initial P&Z hearing] . . . ?
>
> Counsel: The damages at that time I think weren't clear, Your Honor, because we still had access to the funding; we still—we had time, we had months to go and try and make this come to fruition.
>
> The Court: So you didn't have a claim in March?
>
> Counsel: I don't think it was ripe at that time, Your Honor.
>
> The Court: What about June?
>
> Counsel: I don't believe so.
>
> The Court: And not July—really not until December 1?
>
> Counsel: That's my—that's our position. On December 1, when the Federal Government says these funds are gone, our claim becomes fully ripe. . . .

*Id.* at 56:58–57:41.* We take Plaintiffs at their word. *See Bernhard v. Whitney Nat'l Bank*, 523 F.3d 546, 551 (5th Cir. 2008). Thus the "injury in fact" of which they complain is the total elimination of federal funding that occurred on December 1, 2015. Competent summary judgment evidence supports that asserted injury. So the next question is whether the injury is fairly traceable to the City.

---

* The block quotations have been modified for clarity but are materially identical to the discussion that took place at argument. The full discussion is available at https://www.ca5.uscourts.gov/OralArgRecordings/19/19-40717_1-8-2021.mp3.

B.

It is not. Standing requires a "causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. This connection is lacking where "the challenged action of the defendant [is] . . . the result of the independent action of some third party not before the court." *Ibid.* (quotation omitted). Obviously, it's also lacking where the plaintiff's injury is self-inflicted. *See Ctr. for Biological Diversity*, 937 F.3d at 540–41.

Here, the summary judgment record makes clear that Plaintiffs' December 1 loss of federal funding was the combined result of third-party actions and self-inflicted harm. LRGVDC, not the City, set the December 1 deadline for Plaintiffs to begin construction. Plaintiffs let half of their allotted time evaporate before they requested rezoning. That was not the City's fault. When the P&Z Commission recommended denying Plaintiffs' request, they did not pursue a favorable ruling from the City Commission; they opted instead to conduct a community-engagement effort and submit a new plan to the P&Z Commission three months later. On the day of the P&Z Commission's scheduled hearing to consider the revised plan, Plaintiffs withdrew it. Then they waited until September 2015 to present a new 16-unit plan to City officials. At that point, 17 months had passed since LRGVDC conditionally granted funding to the Plaintiffs. And three months remained until the December 1 deadline. Plaintiffs were in a pinch—but it was a pinch of their (and LRGVDC's) own making.

It's true that the City assumed a more active role during the last few months of Plaintiffs' scramble to secure funding: City officials rejected the 16-unit plan in September and rejected a subsequent 10-unit plan in November. But it's also irrelevant. As discussed above, Plaintiffs have repeatedly disclaimed any injury predating the complete loss of funds that occurred on December 1. And when we focus on that December 1 injury, it's

clear the City had nothing to do with it. In fact, the City took steps to help Plaintiffs avoid their asserted injury by agreeing to approve a four-unit project. It was LRGVDC that sank the four-unit proposal, and it was LRGVDC that enforced the December 1 deadline. Thus, Plaintiffs' injury is not fairly traceable to the City. *See Lujan*, 504 U.S. at 560.

AFFIRMED.