# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 14, 2026

Lyle W. Cayce
Clerk

———————

No. 24-60580

———————

SOUTH TEXAS ENVIRONMENTAL JUSTICE NETWORK,

*Petitioner*,

*versus*

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; BROOKE PAUP, *in her official capacity as Chairperson of the Texas Commission on Environmental Quality*; KELLY KEEL, *in her official capacity as Executive Director of the Texas Commission on Environmental Quality*,

*Respondents*.

———————————————————

Petition for Review of an Order of the
Civil Aeronautics Board
Agency No. 2019-0624-AIR

———————————————————

Before HIGGINBOTHAM, HO, and DOUGLAS, *Circuit Judges*.
PATRICK E. HIGGINBOTHAM, *Circuit Judge*:

Texas LNG is a liquid-natural-gas (LNG) terminal project in Brownsville, Texas. Since 2021, the executive director of the Texas Commission on Environmental Quality (TCEQ) has granted Texas LNG three extensions of its deadline to begin construction. South Texas Environmental Justice Network (STEJN) moved to overturn the third extension of the construction deadline, which TCEQ denied. This is a direct

No. 24-60580

petition for review challenging TCEQ's denial of STEJN's motion to overturn. We DENY the petition.

**I**

The Clean Air Act authorizes the Environmental Protection Agency (EPA) to establish nationwide air-pollution standards.[1] The 1970 amendments to the Clean Air Act introduced National Ambient Air Quality Standards (NAAQS), "which require concentrations of common air pollutants at levels safe to human health," and charged the EPA with setting them.[2] States help enforce NAAQS through EPA-approved state implementation plans (SIPs).[3] Every state's SIP must include a New Source Review (NSR) scheme—"a preconstruction permitting program for all new, stationary pollution sources"—that distinguishes between "major" and "minor" sources.[4] "Major sources are facilities that emit more than a pre-identified amount . . . of a regulated contaminant" and are subject to strict requirements.[5] "Minor" sources, on the other hand, emit a regulated contaminant below significant-impact levels (SILs) and require only an abbreviated air-quality analysis.[6]

Texas LNG applied for minor-source NSR permits from the Federal Energy Regulatory Commission (FERC) and TCEQ, "the agency responsible for enforcing the federal and state versions of the Clean Air Act,"

_____

[1] 42 U.S.C. §§ 7408–09; *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 821–22 (5th Cir. 2003).

[2] *Texas v. EPA*, 690 F.3d 670, 674 (5th Cir. 2012).

[3] *Id.* at 674–75; 42 U.S.C. § 7407.

[4] *Texas*, 690 F.3d at 674 (citing 40 C.F.R. § 51.160).

[5] *Id.* at 675.

[6] *Id.*; *Sierra Club v. La. Dep't of Env't Quality*, 100 F.4th 555, 565–66 (5th Cir. 2024).

No. 24-60580

to build an LNG terminal on a 625-acre site bordering the Brownsville Ship Channel.[7] The permit application required Texas LNG to show, among other things, that its proposed facility would satisfy Best Available Control Technology (BACT)[8] standards and NAAQS, specifically for particulate matter[9] 2.5 microns or less in diameter ($PM_{2.5}$). FERC and TCEQ granted the permits, and litigation challenging those decisions followed.[10] The D.C. Circuit remanded the case to FERC without vacating the agency's order authorizing the permit, which FERC later upheld, and the Third Court of Appeals in Austin dismissed the challenge to the TCEQ permit for lack of subject-matter jurisdiction.[11] That litigation delayed Texas LNG's construction timeline.

---

[7] *Port Arthur Cmty. Action Network v. TCEQ*, 147 F.4th 560, 563 (5th Cir. 2025); TCEQ, *An Order Granting the Application by Texas LNG Brownsville LLC for Permit No. 139561*, TCEQ Docket No. 2019-0624-AIR, SOAH Docket No. 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, 2020 WL 2544372 (May 14, 2020) (TCEQ permit); *City of Port Isabel v. FERC*, 111 F.4th 1198, 1204 (D.C. Cir. 2024), *on reh'g in part*, 130 F.4th 1034, 1038–39 (D.C. Cir. 2025) (discussing FERC permit); *TCEQ v. Vecinos Para El Bienestar De La Comunidad Costera*, No. 03-21-00395-CV, 2023 WL 4670340, at *3, *6 (Tex. App.—Austin July 21, 2023, no pet.) (discussing TCEQ permit).

[8] *Port Arthur Cmty. Action Network*, 147 F.4th at 563. TCEQ's rules define BACT as "[a]n air pollution control method for a new or modified facility that through experience and research, has proven to be operational, obtainable, and capable of reducing or eliminating emissions from the facility, and is considered technically practical and economically reasonable for the facility. The emissions reduction can be achieved through technology such as the use of add-on control equipment or by enforceable changes in production processes, systems, methods, or work practice." 30 TEX. ADMIN. CODE § 116.10(1).

[9] Particulate matter is "the term for a mixture of solid particles and liquid droplets found in the air," *i.e.*, "dust, direct, soot, or smoke." *Particulate Matter (PM) Basics*, EPA (May 30, 2025), https://www.epa.gov/pm-pollution/particulate-matter-pm-basics. $PM_{2.5}$ are "fine inhalable particles" with diameters of 2.5 micrometers or less. *Id.*

[10] *City of Port Isabel*, 130 F.4th at 1038–39; *Vecinos*, 2023 WL 4670340, at *3, *6.

[11] *City of Port Isabel*, 130 F.4th at 1038–39; Texas LNG Brownsville LLC, 192 FERC ¶ 61,170 at 36–37 (2025) (order reaffirming Texas LNG's permit on remand from

Failure to timely begin construction typically renders a permit void.[12] TCEQ's rules, however, afford permittees up to three extensions of the construction deadline.[13] The first extension of 18 months may "be granted solely at the request of the permit holder."[14] To receive a second extension under subsection 116.120(b),

> (b)...[T]he permit holder [must] demonstrate[] that emissions from the facility will comply with all rules and regulations of the commission and the intent of the TCAA, including protection of the public's health and physical property; and
>
>> (1) the permit holder is a party to litigation not of the permit holder's initiation regarding the issuance of the permit; or
>>
>> (2) the permit holder has spent, or committed to spend, at least 10% of the estimated total cost of the project up to a maximum of $5 million.[15]

Subsection 116.120(c), governing third extensions, provides "[a] permit holder granted an extension under subsection (b)(1) of this section may receive one subsequent extension if the permit holder meets the conditions of subsection (b)(2) of this section."[16] In other words, a permittee that received an extension due to litigation delays may receive a third extension if it satisfies the expenditure requirement.

---

the D.C. Circuit and granting a five-year extension to begin construction); *Vecinos*, 2023 WL 4670340, at *3, *6.

[12] 30 Tex. Admin. Code § 116.120(a)(1).

[13] *Id.* § 116.120(b)–(c).

[14] *Id.* § 116.120(b).

[15] *Id.*

[16] *Id.* § 116.120(c).

No. 24-60580

TCEQ's commissioners have delegated authority to the executive director to approve construction-deadline extensions.[17] After a permittee receives its first extension, the permit becomes "subject to revision" based on updated BACT or emissions information.[18]

Texas LNG's initial construction deadline was November 12, 2021. It applied for its first extension on September 20, 2021, citing pandemic-related delays. TCEQ's executive director, Kelly Keel, granted the first extension on October 15, 2021, and reset the construction deadline for May 12, 2023. On April 18, 2023, Texas LNG requested a second extension, citing litigation-related delays, and included updated BACT and federal-applicability analyses. The executive director approved the second extension on June 8, 2023, and reset the deadline for November 12, 2024. Texas LNG sought a third and final extension on May 13, 2024, attaching evidence that it received a litigation-based extension and its expenditures exceeded ten percent of the project cost. It again submitted updated BACT and federal-applicability analyses, confirming no changes had occurred since the permit's issuance. The executive director approved the third extension on July 22, 2024, and set the final deadline to begin construction for May 12, 2026.

STEJN, an environmental-justice advocacy group, filed a motion to overturn and a request for reconsideration of the third extension. TCEQ requested additional briefing from the executive director, Texas LNG, and TCEQ's Office of Public Interest, which "represent[s] the public interest as a party to matters before the commission."[19] The executive director and Texas LNG urged the commission to deny the motion to overturn. The

---

[17] Tex. Water Code §§ 5.052(a), 5.122; 30 Tex. Admin. Code §§ 50.131(b)(6), 116.120(b).

[18] 30 Tex. Admin. Code § 116.120(b).

[19] Tex. Water Code § 5.271.

No. 24-60580

Office of Public Interest recommended the commission grant the motion to overturn on the issue of the facility's compliance with recently updated NAAQS. STEJN's motion to overturn was denied by operation of law as TCEQ failed to issue a decision.[20]

STEJN filed a petition for review in this court, asserting (1) the permit became void before the third extension because the second extension was procedurally flawed; (2) the executive director lacked the authority to grant the third extension because she did not comply with section 50.133's procedural requirements for extension applications; and (3) Texas LNG did not satisfy section 116.120's requirements to receive a third extension.[21] Texas LNG intervened.

## II

Although petitions for review of TCEQ decisions ordinarily must be filed in Travis County, the Natural Gas Act (NGA) provides the Fifth Circuit original and exclusive jurisdiction over petitions to review "an order or action of . . . a State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval . . . required under Federal law" concerning natural-gas terminals.[22] As Texas law governs an appeal of TCEQ's decision, we review

---

[20] 30 Tex. Admin. Code § 50.139(f).

[21] *Id.* §§ 50.133, 116.120. STEJN's motions to overturn and reconsider, as well as the Office of Public Interest's brief, objected to the confidential filing of Texas LNG's evidence showing compliance with subsection 116.120(b)(2) and argued the record lacked sufficient evidence to support the executive director's approval. As all parties have since been granted access to view these records under seal, STEJN has abandoned this issue.

[22] Tex. Health & Safety Code § 382.032; Tex. Water Code § 5.351; 15 U.S.C. § 717r(d)(1); *Sierra Club*, 100 F.4th at 564–65 (holding state administrative agency acts pursuant to federal law for the purposes of the NGA when it issues an order pursuant to a SIP); 40 C.F.R. § 52.2270(c) (identifying EPA-approved regulations in Texas's SIP, including TCEQ's construction-deadline extensions in section 116.120).

*de novo* "whether the [Commission's] action is invalid, arbitrary, or unreasonable," which Texas courts construe "to incorporate the standard of review under the Texas Administrative Procedure Act."[23] Under that statute, agency action may be reversed or remanded if "not reasonably supported by substantial evidence" or "arbitrary or capricious."[24] Reviewing for substantial evidence, we determine "not whether the agency reached the correct conclusion, but rather whether there is some reasonable basis in the record for its action," and we presume agency decisions are supported by substantial evidence unless the petitioner demonstrates otherwise.[25] We "remand for arbitrariness if we conclude that the agency has not genuinely engaged in reasoned decision-making."[26]

## III

### A

We begin with standing. STEJN is an association, so it must satisfy the associational-standing doctrine's three elements: "(1) the association's members would independently meet the Article III standing requirements [of injury, causation, and redressability]; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation

---

[23] *Port Arthur Cmty. Action Network*, 147 F.4th at 565 (quoting Tex. Health & Safety Code § 382.032(e)); *see also Sierra Club*, 100 F.4th at 562 (holding that Louisiana law applies in judicial review of the LDEQ's permitting decision in an NGA case).

[24] *Port Arthur Cmty. Action Network*, 147 F.4th at 565 (quoting Tex. Gov't Code § 2001.174(2)(E)–(F)).

[25] *Collins v. Tex. Nat. Res. Conservation Comm'n*, 94 S.W.3d 876, 881 (Tex. App.—Austin 2002, no pet.); *Heritage on San Gabriel Homeowners Ass'n v. TCEQ*, 393 S.W.3d 417, 424 (Tex. App.—Austin 2012, pet. denied).

[26] *Heritage*, 393 S.W.3d at 423–24 (quotations and citation omitted).

of individual members."[27] TCEQ and Texas LNG argue STEJN lacks standing because its members' alleged injuries are neither traceable to the challenged TCEQ action nor redressable by a favorable decision from this court.

First, we address injury.[28] To maintain suit, STEJN's members must suffer an "injury in fact," meaning "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent."[29] Texas LNG's planned construction site abuts the Bahia Grande Unit of the Laguna Atascosa National Wildlife Refuge and Garcia Pasture, a sacred site of the Carrizo Comecrudo Tribe. STEJN members aver their recreational, aesthetic, and religious experiences in the area surrounding the site will be harmed by the facility's projected air pollution. For example, Juan Mancias and Rebekah Hinojosa regularly fish and hike in the Bahia Grande Unit and allege that breathing polluted air will harm their health. Mancias and Dr. Christopher Basaldu, Carrizo Comecrudo members, assert their ability to worship near Garcia Pasture will be substantially burdened by breathing polluted air. And Mancias, Hinojosa, and Dr. Basaldu all enjoy the aesthetic beauty of the undeveloped area, which the planned construction and flare emissions will obstruct.

STEJN's members' averments are sufficient to establish an injury in fact. "[W]hen a person visits an area for aesthetic purposes, pollution interfering with his [or her] aesthetic enjoyment may cause an injury in fact,"

---

[27] *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006).

[28] *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) (explaining federal courts' independent duty to ensure all prerequisites for subject-matter jurisdiction are met, even if unchallenged).

[29] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotations and citations omitted).

so long as "the aesthetic experience was actually [or imminently] offensive [or harmful] to the plaintiff."[30] And although Texas LNG has yet to begin construction, "[t]he Supreme Court has expressly held that a threatened injury will satisfy the injury in fact requirement for standing."[31]

Next, we consider traceability. "[T]here must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant."[32] As STEJN "is not the object of a government regulation," causation here "depend[s] on how regulated third parties not before the court will act in response to the government regulation or judicial relief."[33] STEJN "must show a predictable chain of events leading from the government action to the asserted injury" to support a conclusion that "third parties [*i.e.*, Texas LNG] will likely react to the government regulation or judicial relief in predictable ways that will likely cause . . . the plaintiff's injury."[34]

TCEQ and Texas LNG argue STEJN lacks causation because its members' injuries stem from the underlying permit for the facility's

---

[30] *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 537, 540 (5th Cir. 2019); *see also, e.g.*, *Citizens for Clean Air & Clean Water in Brazoria Cnty. v. U.S. Dep't of Transp.*, 98 F.4th 178, 188 (5th Cir. 2024) (explaining that petitioners identify concrete interest impaired by agency's action "when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity" (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000))).

[31] *Citizens for Clean Air*, 98 F.4th at 187 (cleaned up) (citation omitted).

[32] *Lujan*, 504 U.S. at 560–61 (cleaned up) (citation omitted); *see also Ctr. for Biological Diversity*, 937 F.3d at 542 ("[STEJN] must show a causal connection between [TCEQ's] allegedly unlawful conduct and their members' asserted injuries.").

[33] *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025).

[34] *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 385 (2024); *Diamond Alt. Energy, LLC*, 606 U.S. at 112 (cleaned up) (citation omitted).

construction, not the third extension of the construction deadline. Although the challenged action here is not the genesis of STEJN's harm, there is a predictable link between TCEQ's decision to uphold the third extension and the members' alleged injuries. Texas LNG will likely respond to the third extension by starting construction before the final deadline on May 12, 2026. Construction could not begin this late without TCEQ's approval.[35] The extension achieves the same goal as the permit—the project can go on—and breaking ground on the facility is the catalyst for the members' injuries.[36] STEJN has demonstrated traceability sufficient to confer standing.

Finally, we turn to redressability. "To determine whether an injury is redressable, a court will consider the relationship between the judicial relief requested and the injury suffered."[37] "[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[38] Petitioners suing to require the agency to comply with procedure "need not show that the procedural remedy that they are requesting will in

---

[35] *But see Deep S. Ctr. for Env't Just. v. EPA*, 138 F.4th 310, 326 (5th Cir. 2025) (finding petitioners failed to trace their members' injuries to the agency's conduct because the underlying construction could take place with or without EPA's action).

[36] *See, e.g.*, *Citizens for Clean Air*, 98 F.4th at 188 (finding petitioners had standing because the agency approved the permit in error, "which, in turn, will lead to the construction of a project causing the injuries claimed above"); *Gulf Restoration Network v. Salazar*, 683 F.3d 158, 167 (5th Cir. 2012) (finding aesthetic and recreational injuries "fairly traceable" to the agency's approvals of various plans to begin construction on drilling (citation omitted)); *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 479 (D.C. Cir. 2009) ("Petitioners have shown, solely for the sake of an Article III standing analysis, that Interior's adoption of an irrationally based Leasing Program could cause a substantial increase in the risk to their enjoyment of the animals affected by the offshore drilling.").

[37] *California v. Texas*, 593 U.S. 659, 671 (2021) (quotations and citation omitted).

[38] *Lujan*, 504 U.S. at 561 (quotations and citation omitted).

fact redress their injuries."[39] Instead, they must "show that there is a possibility that the procedural remedy will redress their injuries" by demonstrating "that the procedures in question are designed to protect some threatened concrete interest of theirs that is the ultimate basis of their standing."[40]

TCEQ and Texas LNG argue a favorable decision from this court would not invalidate the injury-inducing permit, as TCEQ's denial of the motion to overturn the third extension is the only action before us, so STEJN's injuries are not redressable.[41] We disagree. STEJN need only show that TCEQ's reconsideration on remand could *possibly* redress its injuries because TCEQ's procedures are designed to protect its members' "threatened concrete interest[s]."[42] And STEJN meets that bar. TCEQ, as the enforcer of federal and Texas air-pollution laws, has promulgated rules

---

[39] *Gulf Restoration Network*, 683 F.3d at 167 (cleaned up) (citation omitted).

[40] *Id.* at 167–68 (cleaned up) (citation omitted) (finding redressability where agency violated NEPA procedures designed to protect environment); *see also Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) ("When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant."); *Ecosystem Inv. Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287, 293 (5th Cir. 2018) (unpublished) (finding petitioner met "the relaxed standard for redressability" where agency failed to consider alternatives and doing so on remand could "prompt the [agency] to reconsider [its] decision," even though petitioner could not "establish with any certainty" that the agency would change its decision (citations omitted)); *Texas v. United States*, 787 F.3d 733, 753–54 (5th Cir. 2015) (finding redressability where remedy "could prompt [the agency] to reconsider its decision, which is all a litigant must show when enforcing a procedural right").

[41] *See TXI Operations LP v. TCEQ*, 665 S.W.3d 203, 212 (Tex. App.—Austin 2023, pet. denied) (finding "the Commission's decision on [STEJN's] motion to overturn is the final and appealable order," not the executive director's decision).

[42] *Sierra Club v. Glickman*, 156 F.3d 606, 613 (5th Cir. 1998) (quoting *Lujan*, 504 U.S. at 573 n.8).

governing construction extensions and their effect on underlying permits.[43] These procedural hurdles' purpose is to protect the community's aesthetic, recreational, and health-related interests in their environment.[44] Those are precisely the injuries STEJN alleges here, so we find redressability sufficient for standing.

Having established STEJN's members independently meet Article III's standing requirements, we find the remaining elements for associational standing are also satisfied. First, this litigation is germane to STEJN's purposes. STEJN is a nonprofit organization that uses litigation to promote the social and environmental health of Latinx and indigenous communities in the Rio Grande Valley.[45] Resisting the construction of LNG-export terminals in the Port of Brownsville is one of STEJN's key initiatives.[46] Second, resolution in the "group context" is proper as STEJN's members need not participate for the case to progress; "the claims asserted and the relief sought by the petitioners are not particular to any individual" and do not "require individualized proof."[47]

---

[43] *Port Arthur Cmty. Action Network*, 147 F.4th at 563; 30 Tex. Admin. Code § 116.120.

[44] *See* Tex. Water Code § 5.011 (TCEQ's purpose is to "provide more efficient and effective administration of the conservation of natural resources and the protection of the environment in this state"); *Mission Statement*, TCEQ (Mar. 17, 2025), https://www.tceq.texas.gov/agency/mission.html ("[TCEQ] strives to protect our state's public health and natural resources consistent with sustainable economic development. . . . Our goal is clean air.").

[45] *Stopping LNG in the RGV*, STEJN (Aug. 3, 2024), https://sotxejn.org/2024/08/03/stopping-lng-in-the-rgv/.

[46] *Id.*

[47] *Gulf Restoration Network*, 683 F.3d at 168 (cleaned up) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977)).

No. 24-60580

**B**

Turning to the merits, we first address whether the executive director had the authority to grant Texas LNG's third extension request.[48] Two rules are relevant to this procedural issue; which one governs is a question of regulatory interpretation.[49] STEJN argues the executive director lacked authority to grant the third extension because she failed to comply with the procedural requirements in Tex. Admin. Code § 50.133(a). TCEQ and Texas LNG respond that subsection 116.120(b), not 50.133(a), governs the process for the extension request here, and that the executive director complied with the former.

TCEQ's commissioners delegate authority to the executive director to approve construction-deadline extensions in subchapter G of chapter 50 and subchapter B of chapter 116.[50] Chapter 50 governs "action on

---

[48] As a threshold issue, STEJN contends the permit is "void by operation of law" because the *second* extension, although timely requested, was approved after the first construction deadline. TCEQ and Texas LNG respond that STEJN's voidness argument is not properly before us, as the time to appeal the second extension passed without objection and STEJN's petition plainly seeks review of the third extension. Whether we reach the issue or not, the outcome is the same—the permit is valid. Texas law suggests that when a permittee timely requests a extension, the deadline passes, and the agency approves the extension, the permit does not become void. *See R.R. Comm'n of Tex. v. Coppock*, 215 S.W.3d 559, 564–66 (Tex. App.—Austin 2007, pet. denied). Here, as in *Coppock*, the regulation does not require TCEQ to rule on an extension request before the deadline passes for the extension to be effective, nor does it require a permittee to request an extension within a given time before the deadline. *See id.* at 562 n.1, 564–66 (upholding this view even when the underlying law states that "[a] permit terminates if the permit holder has not begun . . . on or before the third anniversary of the date on which the period for which the permit is issued begins" (citation omitted)).

[49] *See, e.g.*, *Port Arthur Cmty. Action Network v. TCEQ*, 707 S.W.3d 102, 104 (Tex. 2025) (interpreting administrative rules consistent with the traditional principles of statutory construction).

[50] 30 Tex. Admin. Code § 50.131(a), (b)(6); *id.* § 116.120(b).

---

applications and other authorizations," and subchapter G deals with "action by the executive director" and "applies to . . . extensions of time to commence or complete construction."[51] Subsection 50.133(a) permits the executive director to act on "applications" subject to subchapter G if: (1) public-notice requirements have been satisfied and the executive director files a response to them; (2) the application is uncontested, complies with the relevant statutory and administrative criteria, and does not raise new issues requiring the interpretation of TCEQ policy or alterations increasing allowable emissions; and (3) neither the executive director's staff nor the Office of Public Interest raise objections.[52] Subchapter G does not, however, "affect the executive director's authority to act on an application where that authority is delegated elsewhere."[53] Nor does it apply to "air quality standard permits under Chapter 116 of this title, except for air quality standard permits that require a decision by the executive director."[54]

Chapter 116 governs "control of air pollution by permits for new construction or modification," and subchapter B covers NSR permits.[55] Therein, subsection 116.120(b) provides "[t]he executive director may grant extensions to begin construction" on projects with NSR permits.[56] But unlike chapter 50, this provision does not condition the executive director's

_____

[51] *Id.* § 50.131(a), (b)(6).

[52] *Id.* § 50.133(a).

[53] *Id.* § 50.131(a).

[54] *Id.* § 50.131(c)(1).

[55] *Id.* § 116.120.

[56] *Id.* § 116.120(b).

authority to grant extensions on any prerequisite, such as notice and comment.[57]

TCEQ and Texas LNG argue section 116.120's grant of authority is separate and distinct from the general delegations found in chapter 50; therefore, the latter's procedural requirements do not apply to the former's specific delegation for construction extensions. We agree. Subchapter G of chapter 50 does not apply to construction-extension requests for NSR permits under chapter 116, and subsection 50.131(c)(1)'s exception does not apply here as a construction-extension request under an NSR permit is not an "air quality standard permit[] that require[s] a decision by the executive director."[58] Similarly, TCEQ's rules elsewhere require notice and comment only for "air quality permit applications or registrations," not extension requests.[59] And most importantly, a specific provision will prevail over a general one where the two conflict.[60] Section 116.120 is more specific to this case. Chapter 116 governs air-pollution permits, and subsection 116.120(b)'s delegation is within the subchapter on NSR permits—the type of permit

---

[57] *Id.*

[58] *Id.* § 50.131(c)(1).

[59] *See, e.g.*, *id.* §§ 39.402, .601 (chapter governing TCEQ's public-notice requirements applies to "[a]ir quality permit applications or registrations" and amendments to permits resulting in significant emissions changes); *id.* § 55.101(a) (stating chapter 55's notice-and-comment requirements, *inter alia*, apply only to "permit applications"); *but see id.* § 55.101(e) (stating "[t]he commission may not seek further public comment or hold a public hearing" for applications to amend, modify, or renew permits "that would not result in an increase in allowable emissions and . . . the emission of an air contaminant not previously emitted").

[60] *See, e.g.*, *Busic v. United States*, 446 U.S. 398, 406 (1980) (citing rule of construction that "a more specific [provision] will be given precedence over a more general one, regardless of their temporal sequence"), *superseded by statute on other grounds*, Comprehensive Crime Control Act of 1984, Pub. L. No. 98-473, § 1005, 98 Stat. 1837, 2138–39 (1984), *as recognized in*, *Abbott v. United States*, 562 U.S. 8, 23 (2010).

No. 24-60580

Texas LNG holds and sought extensions under.[61] Conversely, chapter 50 applies to a variety of permit applications concerning water, waste, drilling, irrigation, and air quality.[62] Thus, subsection 116.120(b) provides "authority [that] is delegated elsewhere" of the kind that subsection 50.131(a) exempts from the requirements of section 50.133.

We conclude the executive director was bound to comply only with section 116.120's requirements, and she did. Section 116.120 imposes no procedural requirements on the executive director before she may grant an extension, detailing only the permittee's burden.[63] The executive director acted within her authority when she granted the third extension.

## C

Finally, we evaluate whether Texas LNG made the requisite showing for a third extension. Everyone agrees that section 116.120 governs a permittee's substantive burden to receive a third construction extension. It provides, in relevant part:

> (b) The executive director may grant extensions to begin construction. Permits issued to holders who have received extensions will be subject to revision based on best available control technology, lowest achievable emission rate, and netting or offsets as applicable. A first extension of 18 months may be granted solely at the request of the permit holder. One additional extension of up to 18 months may be granted if the permit holder demonstrates that emissions from the facility will comply with all rules and regulations of the commission

---

[61] *See INS v. Nat'l Ctr. for Immigrants' Rts., Inc.,* 502 U.S. 183, 189 (1991) ("[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text.").

[62] 30 Tex. Admin. Code § 50.131(b).

[63] *Id.* § 116.120.

and the intent of the TCAA, including protection of the public's health and physical property; and

> (1) the permit holder is a party to litigation not of the permit holder's initiation regarding the issuance of the permit; or

> (2) the permit holder has spent, or committed to spend, at least 10% of the estimated total cost of the project up to a maximum of $5 million.

(c) A permit holder granted an extension under subsection (b)(1) of this section may receive one subsequent extension if the permit holder meets the conditions of subsection (b)(2) of this section.[64]

TCEQ and Texas LNG argue permittees must satisfy only two conditions to obtain a third extension under subsection 116.120(c): (1) prior receipt of an extension under subsection 116.120(b)(1) and (2) proof it has spent or committed to spend the requisite amount under subsection 116.120(b)(2). STEJN does not dispute that the executive director granted Texas LNG's second extension because of litigation. And the record contains substantial evidence showing Texas LNG "has spent, or committed to spend, at least 10% of the estimated total cost of the project up to a maximum of $5 million."[65] So, Texas LNG has indisputably met both of subsection 116.120(c)'s express conditions.

But STEJN claims a third extension requires more. It argues Texas LNG must also demonstrate "emissions from the facility will comply with all rules and regulations of the commission and the intent of the TCAA" to protect public health, as stated in the "parent provision" to subsections

---

[64] *Id.*

[65] *Id.* § 116.120(b)(2).

(b)(1) and (2).[66] STEJN argues this "parent provision" requires permittees to re-do the technical analyses underlying the permit when applying for a third extension—in other words, to show compliance with BACT determinations in recently issued NSR permits and current NAAQS—and that Texas LNG failed to do so. Thus, the issue is one of construction: does the parent provision in (b) apply to (c), where (c) references compliance with subparts (b)(1) and (2)? As STEJN fails to cite a case validating its interpretation, we turn to the well-worn rules of construction, which apply to regulations and statutes alike.[67]

Generally, "material within an indented subpart relates only to that subpart" and "material contained in unindented text relates to all the following or preceding indented subparts."[68] And "absent reason to think otherwise, statutory provisos generally modify only the provisions in which they sit."[69] By the plain text, subsection 116.120(b) governs first and second extensions and subsection 116.120(c) governs third extensions.[70] Subsection (c) is not a "following or preceding indented subpart" to subsection (b); it is simply the next unindented provision in the section.[71] If a permittee has obtained a second extension under subsection (b)(1), the commission

---

[66] *Id.*

[67] *See Port Arthur Cmty. Action Network*, 707 S.W.3d at 104.

[68] Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 156 (2012); *see Matter of Pirani*, 824 F.3d 483, 495 (5th Cir. 2016) (endorsing scope-of-subparts canon).

[69] *Martin v. United States*, 605 U.S. 395, 405 (2025) ("[A]n ordinary reader would naturally presume that the proviso modifies only [its own subsection].").

[70] 30 Tex. Admin. Code § 116.120(b) (discussing "first extension" and "[o]ne additional extension"); *id.* § 116.120(c) (discussing "one subsequent extension" after permittee receives a second extension under subsection 116.120(b)(1)).

[71] Scalia & Garner, *supra* note 68, at 156; *see Pirani*, 824 F.3d at 495.

necessarily has found the holder "demonstrate[d] that the emissions from the facility will comply with all rules and regulations of the commission and the intent of the TCAA" and was "a party to litigation not of the permit holder's initiation regarding the issuance of the permit."[72] Having shown that, subsection 116.120(c)'s only additional requirement is to "meet[] the conditions of subsection (b)(2)" concerning expenditures.[73] Subsection (b)'s "parent provision" *relates* to subsection (c) insofar as the former must have been satisfied for the permittee to have received a second extension, but nothing in the text suggests the permittee must demonstrate anew that "emissions from the facility will comply with all rules and regulations of the commission and the intent of the TCAA" to receive a third extension.[74] Indeed, "relation is different than rewriting a [regulation]."[75] STEJN's attempt to transplant additional requirements from a nearby provision into subsection (c) is unavailing, as "[n]othing is to be added to what the text states or reasonably implies."[76]

---

[72] 30 Tex. Admin. Code § 116.120(b).

[73] *Id.* § 116.120(c).

[74] *Id.* § 116.120(b)–(c); *see Martin*, 605 U.S. at 406 (stating it is "hard to see" how provisions within a subsection might modify provisions "housed in separate subsections (and separate sentences) elsewhere in" the statute); *Sandras v. State Farm Fire & Cas. Co.*, No. 1:24CV5-HSO-RPM, 2025 WL 2907397, at *6 (S.D. Miss. Sept. 5, 2025) (ordinary presumptions of the scope-of-subparts canon apply "unless the circumstances in which the text was created suggest its formatting 'was not something that the drafters of the text enacted'" (quoting Scalia & Garner, *supra* note 68, at 156)).

[75] *United States v. Lowell*, 2 F.4th 1291, 1296 (10th Cir. 2021) (discussing scope-of-subparts canon).

[76] Scalia & Garner, *supra* note 68, at 93–100 (describing the omitted-case canon); *see also United States v. Mississippi*, 82 F.4th 387, 393 (5th Cir. 2023) ("[W]e may not enhance the scope of a [rule] because we think it good policy or an implementation of [the agency's] unstated will."); *Martin*, 605 U.S. at 406 ("If Congress had wished the

Even if section 116.120 required permittees to re-do the "parent provision" analysis to receive a third extension, there is substantial evidence in the record showing Texas LNG met that burden. Texas law requires TCEQ to conduct a rigorous, technical assessment of air-pollution control requirements, like BACT, for a proposed technology before a permit may issue.[77] In its third extension request in 2024, Texas LNG stated the BACT determinations from the initial permitting process in 2020—deemed sufficient by TCEQ at the time—satisfy current BACT requirements because "no new control techniques [have] developed since the issuance of this permit; therefore, BACT for the equipment at the facility remains unchanged." Texas LNG attached an itemized summary and comparison chart of the permit's BACT requirements to show it remains consistent with current Tier I BACT requirements and associated TCEQ permitting policies. After reviewing the third extension application, TCEQ found Texas LNG "has demonstrated compliance with current BACT and has not made changes to the previously authorized project, which was demonstrated to be protective of human health." Accordingly, we find this evidence constitutes "some reasonable basis in the record" for TCEQ's approval.[78]

The same goes for compliance with NAAQS. Texas LNG is eligible for a minor-source NSR permit because the proposed facility's anticipated impact on ambient concentration of $PM_{2.5}$ falls below the NAAQS's current SIL for that contaminant. The SIL for annual $PM_{2.5}$ when TCEQ approved

---

proviso to modify [beyond the subsection where it is found], it might have provided a section-wide [provision].").

[77] *See* 30 TEX. ADMIN. CODE § 116.111(a)(2)(C) (requiring BACT "be evaluated for and applied to" the facility before NSR permit may be granted); *id.* § 116.114(a)(2), (c) (draft NSR permit undergoes public notice and comment and is subject to contested-case hearing procedures after commission's technical review).

[78] *Collins*, 94 S.W.3d at 881.

Texas LNG's permit was 0.2 μg/m$^3$.[79] It decreased to 0.13 μg/m$^3$ three months before TCEQ granted the third extension.[80] The modeling analysis in Texas LNG's minor-source permit application predicted an annual PM$_{2.5}$ concentration of 0.06 μg/m$^3$, and its most recent analysis predicted 0.1 μg/m$^3$—both well below the SIL for annual PM$_{2.5}$ when the permit issued and now. In August 2025, on remand from the D.C. Circuit, FERC similarly assessed Texas LNG's most recent air-modeling analysis and affirmed the project's continued compliance with updated NAAQS.[81]

Moreover, Texas LNG's third extension application demonstrates its continued status as a minor source. It states (1) "there are no proposed or existing nonattainment designations" for the proposed site; (2) there are "no change[s] to the Prevention of Significant Deterioration (PSD)[82] regulations or PSD applicability criteria," and (3) the "scope and design of the project remain as it was initially authorized." In other words, the project remains classified as a minor source due to low-emissions design features and is "not subject to federal nonattainment and PSD permitting requirements" for major sources. Even if the rules required Texas LNG to submit additional proof of NAAQS compliance to receive a third extension, there is substantial evidence in the record to support TCEQ's decision.

---

[79] EPA, Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program, at 15–16 (Apr. 17, 2018).

[80] EPA, Supplement to the Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program, at 6 (Apr. 30, 2024).

[81] Texas LNG Brownsville LLC, 192 FERC ¶ 61,170 at 36–37.

[82] PSD is a permitting program under the Clean Air Act that regulates new or modified major sources of air pollution. *See Port Arthur Cmty. Action Network*, 147 F.4th at 563.

Subsection 116.120(c) governs third extensions and plainly requires only two conditions. As "the evidence as a whole is such that reasonable minds could have [concluded]" Texas LNG received a litigation-related extension and satisfied the expenditure requirements, TCEQ did not err in denying STEJN's motion to overturn.[83] Even applying the more rigorous standard urged by STEJN, we find substantial evidence in the record supports TCEQ's action.

## IV

We conclude the executive director complied with the controlling requirements of section 116.120 and her approval of the third extension is supported by substantial evidence in the record. Accordingly, we DENY STEJN's petition for review.

---

[83] *Collins*, 94 S.W.3d at 881.